[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-10160

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 24, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 99-01097-CV-T-26TBM-8

KATHRYN RINK, et al.,

Plaintiffs,

BARBARA MCFARLAND, individually
and on behalf of all persons similarly
situated in the State of Florida,
GINO GAVONI, SR.,
LISA GAVONI, both individually and as
parents, natural guardians and next of friend
of Victoria Gavoni and Gino Gavoni, Jr., both
minors, and on behalf of all persons similarly
situated in the State of Florida,
MICHAEL ANOLFO, individually and as parent,
natural guardian and next friend of Courtney
Anolfo, a minor, and on behalf of all persons similarly
situated in the State of Florida,
ANGELINA DES AUSTELLES, individually
and on behalf of all persons similarly
situated in the State of Florida,
MARK KNIERIM, individually
and on behalf of all persons similarly
situated in the State of Florida,

Plaintiffs-Appellants,

versus

CHEMINOVA, INC.,
CHEMINOVA A/S,
Successor to Cheminova Argo A/S,
AURIGA INDUSTRIES A/S,
Successor to Cheminova Holding A/S,

                                                  Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

**(February 24, 2005)**

Before BIRCH, BARKETT and COX, Circuit Judges.

BIRCH, Circuit Judge:

This appeal arises from the products liability and toxic trespass claims of nine individuals who allege they were exposed to a virulent substance used as a pesticide in Florida. The district court granted summary judgment to the manufacturer of the substance and its related entities following the court's exclusion of expert testimony under the principles of <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S. Ct. 2786 (1993). Because the district court properly executed its gatekeeping function under <u>Daubert</u>, we find no abuse of discretion in the district court's exclusion of expert testimony. Further, because the requisite proof of causation was lacking without the expert testimony, we

**AFFIRM** the district court's grant of summary judgment.

## I. BACKGROUND

In May 1997, a Mediterranean fruit fly ("medfly") was discovered in Florida. To protect the state's agricultural industry from the harmful effects of a medfly infestation, the Florida Department of Agriculture and Consumer Services ("FDACS") and the United States Department of Agriculture ("USDA") decided to engage in aerial and ground spraying of a mixture of protein bait and malathion, a pesticide, to eradicate the medflies. Consequently, FDACS and USDA purchased malathion under the trade name Fyfanon from its manufacturer Cheminova A/S.[1] The Fyfanon was shipped from Cheminova's plant in Denmark to the United States where it was deposited into storage facilities in Texas, Georgia, and Florida. The Fyfanon was then transported by Cheminova, Inc. from these storage sites to Tampa, Florida where FDACS and USDA officials mixed the malathion with the protein bait and promptly sprayed the mixture over the Tampa metropolitan area and the surrounding counties. Shortly thereafter, certain individuals reported becoming seriously ill and subsequently brought this suit on behalf of themselves

---

[1]Cheminova A/S, Cheminova, Inc., and Auriga Industries A/S are the three Defendants-appellees (collectively "Cheminova") in this appeal. Cheminova A/S is a Danish company that manufactures pesticides. Cheminova, Inc. is a New Jersey corporation which is wholly-owned by Cheminova A/S and is responsible for sales and distribution of Cheminova A/S products in the United States. Cheminova A/S, in turn, is wholly-owned by Auriga Industries A/S, a Danish company.

and others similarly situated in the State of Florida alleging, inter alia, products liability, negligence, and toxic trespass claims as a result of their exposure to the Fyfanon in the medfly spray.

The theories of liability asserted by the putative class representatives[2] hinged on their allegations that the Fyfanon ultimately sprayed over Tampa was defective and caused their injuries. The specific defect they alleged was that the Fyfanon contained elevated levels of isomalathion due to improper storage. Isomalathion is a malathion derivative which renders malathion particularly toxic to humans. The putative class representatives maintained that, prior to its delivery to FDACS and USDA, Cheminova A/S and Cheminova, Inc. allowed the Fyfanon to be exposed to temperatures exceeding those recommended for safe storage,[3] which precipitated a chemical decomposition of the malathion that produced increased levels of isomalathion.

To prove these claims, the putative class representatives retained Dr. Jack Matson as an expert to reconstruct the temperatures to which the Fyfanon was exposed and to render an opinion as to the isomalathion content in the Fyfanon

---

[2] In a July 2001 order, the district court refused to certify a class action pursuant to Fed. R. Civ. P. 23(c)(4)(A) on the issue of whether Cheminova delivered defective Fyfanon to FDACS and USDA. The propriety of that order is before us in this appeal in addition to the district court's exclusion of expert witnesses and its grant of summary judgment.

[3] The United States Environmental Protection Agency label on Fyfanon containers indicates that Fyfanon should not be stored at temperatures exceeding 77 degrees Fahrenheit.

4

ultimately used by FDACS and USDA over Tampa. Although Matson held a Ph.D. in chemical engineering and had previously worked with pesticides, he had no experience with malathion prior to being retained as an expert in this case. Matson issued reports on his findings in October 2000, May 2001, and July 2002, and he opined a final conclusion in his January 2003 deposition. In the October 2000 report, he concluded that the Fyfanon was stored at temperatures exceeding 77 degrees Fahrenheit. He calculated these temperature figures by starting with national weather service temperature readings of the areas near the storage sites. He used the recorded high and low temperatures as the upper and lower limits of the probable temperature to which the Fyfanon was exposed. Then, on the basis of some evidence that the temperature inside the Texas storage facility was actually eighteen degrees higher than the ambient air temperature recorded by the weather service,[4] he added eighteen degrees to the upper limits of plausibility for each site.[5] Then, Matson averaged the upper and lower limits to arrive at the most

[4] Matson derived the eighteen degree differential based on information he received that some of the barrels in which the Fyfanon was being stored at the Texas site were melting. Matson researched the temperature at which the plastic in the barrels melted, subtracted the ambient temperature reported by the weather service reports, and found the difference to be eighteen degrees.

[5] Matson did not visit each storage site or account for differences in the way Fyfanon was stored at each site. Accordingly, his decision to increase the upper limit for all the sites was based on his conjecture that the storage methods and atmospheric conditions at each site were similar. Evidence in the record demonstrated, however, that temperature, length of storage, and storage conditions varied at each storage site.

probable temperature to which the Fyfanon was exposed. This figure was then input into an equation which calibrated the level of isomalathion as a function of time and temperature exposure. Matson utilized the same methodology to derive temperature data in his May 2001 report. In his July 2002 report, Matson also claimed that eighteen degrees should be added to the upper limit of plausibility, although his explanation for the increase in this report was based on his theory of temperature increases due to the radiant energy of the sun. Finally, in his January 2003 deposition, Matson again concluded that the Fyfanon was exposed to temperatures exceeding the recommended 77 degrees Fahrenheit, although he based his conclusions on the autocatalytic effect that dimethyl sulfide produces in malathion when it is stored for a certain period of time.

Following Matson's deposition, Cheminova filed a motion to exclude expert testimony and a <u>Daubert</u> hearing ensued. At the conclusion of the five-day hearing, the district court excluded Matson because "the methodology by which he arrived at his ultimate conclusion is fundamentally flawed because it is not based on . . . sufficiently reliable data or facts." R3-570 at 8. The district court found that "there is simply too great an analytical gap between the data relied on by Dr. Matson and his proffered opinions." R3-570 at 8. In making this conclusion, the district court criticized Matson's method of extrapolating temperature data from

6

one site to another without making particularized findings which accounted for the differences in conditions and length of storage at each site. In addition, the district court faulted Matson for: (1) his lack of prior experience with malathion, (2) his failure to visit the Fyfanon storage sites, (3) his failure to consider the testimony of workers at the various storage facilities, and (4) his continued use of certain data in later reports that had been deemed unreliable. In discussing this fourth flaw in Matson's methodology, the district court noted that the unreliability of his earlier data undermined his later calculations which used different methods but arrived at similar results. After making these observations, the district court added that there was no testimony that Matson's method was tested, subjected to peer review, or generally accepted in the scientific community. Based on all of these findings, the district court granted Cheminova's motion to exclude Matson. In addition, the district court concluded that it necessarily followed that all the toxicology experts and treating physicians should be excluded as well because the relevance of their testimony depended on Matson's findings.

Without the testimony of Matson or any other toxicology expert, the district court found that proof of causation was lacking. Particularly, the district court noted that the putative class representatives could not identify: (1) the isomalathion levels in the Fyfanon when it was ultimately delivered to FDACS and USDA, and

7

(2) the level of isomalathion at which the Fyfanon becomes defective, i.e. toxic to humans. Because evidence of causation was lacking, the district court granted summary judgment in favor of Cheminova. In making this ruling, the district court also denied the class representatives' request for a continuance to remedy the lack of causation evidence which resulted from the court's exclusion of Matson.

The putative class representatives make four arguments on appeal. First, they argue that the district court erred by excluding Matson and their other experts. Second, they contend that, even without the testimony of these experts, summary judgment was improperly granted because they did submit sufficient evidence of causation. Third, they argue that the district court erred by refusing to grant a continuance following the exclusion of their experts. Fourth, they argue that the district court improperly construed the requirements of Fed. R. Civ. P. 23(c)(4)(A) and therefore erred by refusing to grant class certification. We will address each argument in turn.

## II. DISCUSSION

A. Exclusion of Expert Testimony

We review a district court's decision to exclude an expert's testimony under an abuse of discretion standard. See Kumho Tire Co. v. Carmichael, 526 U.S. 137,

8

152, 119 S. Ct. 1167, 1176 (1999). This standard of review requires that we defer to the district court's ruling unless it is "'manifestly erroneous.'" Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340 (11th Cir. 2003) (quoting General Elec. Co. v. Joiner, 522 U.S. 136, 142, 118 S. Ct. 512, 517 (1997)). Because the task of evaluating the reliability of expert testimony is uniquely entrusted to the district court under Daubert, see McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002), we give the district court "considerable leeway" in the execution of its duty. Kumho Tire Co., 526 U.S. at 152, 119 S. Ct. at 1176.

The admission of expert evidence is governed by Federal Rule of Evidence 702,[6] as explained by Daubert and its progeny. Under Rule 702 and Daubert, district courts must act as "gatekeepers" which admit expert testimony only if it is both reliable and relevant. See Daubert, 509 U.S. at 589, 113 S. Ct. at 2795. District courts are charged with this gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury" under the mantle

---

[6] Rule 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
Fed. R. Evid. 702.

of reliability that accompanies the appellation "expert testimony." McCorvey, 298 F.3d at 1256. To fulfil their obligation under Daubert, district courts must engage in a rigorous inquiry to determine whether: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998) (footnote omitted). The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence. See Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999).

In ascertaining reliability under the second Daubert prong, we have identified several factors which can be considered: (1) whether the expert's methodology can be tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method has a known rate of error; (4) whether the technique is generally accepted by the scientific community. Quiet Tech. DC-8, Inc., 326 F.3d at 1341. This list of factors, however, "do[es] not exhaust the universe of considerations that may bear on . . .

10

reliability." Id.; see also Kumho Tire Co., 526 U.S. at 150, 119 S. Ct. at 1175

("Daubert makes clear that the factors it mentions do not constitute a 'definitive

checklist or test.'") (citation omitted); Daubert, 509 U.S. at 594, 113 S. Ct. at 2797

(noting that the Rule 702 inquiry is "a flexible one"). District courts "have

substantial discretion in deciding how to test an expert's reliability . . . ." United

States v. Majors, 196 F.3d 1206, 1215 (11th Cir. 1999) (internal citation omitted).

The putative class representatives argue that Matson's exclusion was

improper for two reasons. First, they argue that the district court improperly based

its determination on Matson's general personal credibility, thereby assuming the

role of the trier of fact. A thorough review of the record reveals that this objection

is unfounded; the district court's exclusion of Matson was grounded in its criticism

of his method, not his credibility. For example, the district court faulted Matson

for his facile transposition of temperature data from one site to another. Under

Matson's method, temperature data from the Texas storage site could be applied to

the Georgia and Florida sites because storage conditions were supposedly similar

and the sites were all in the same basic latitudinal range. Transposition of data

based on such conjecture and rough approximation lacks the "intellectual rigor"

required by Daubert. Kumho Tire Co., 526 U.S. at 152, 119 S. Ct. at 1176.

Additionally, the district court critiqued Matson's conclusion that eighteen degrees

should be added to the upper limit of the plausible temperature to which the Fyfanon was exposed. Whether it was based on evidence that some of the barrels at the Texas site were melting or evidence of radiant energy from the sun or an autocatalytic effect, the district court found, and we agree, that Matson's addition of eighteen degrees required the kind of scientifically unsupported "leap of faith" which is condemned by Daubert. See Rider v. Sandoz Pharms. Corp., 295 F.3d 1194, 1202 (11th Cir. 2002). Apart from these particularized criticisms, the district court found Matson's methods of data transposition and temperature extrapolation failed under the reliability factors we mentioned in Quiet Technology because the methods were not tested, subjected to peer review, or generally accepted in the scientific community. Finally, the district court criticized Matson's method of continuing to use data in subsequent reports which was previously found to be unreliable. The record thus reflects that the district court properly rejected Matson on the basis of his flawed methodology. While the putative class representatives argue that an isolated remark by the district court—that Matson's final conclusions were undermined by his previously flawed reports—represents an impermissible credibility determination, we find that, because the district court's evaluation was properly cabined to a critique of Matson's method, that argument is misplaced.[7]

_____

[7] We note that the argument made by the putative class representatives misconstrues the difference between a district court's evaluation of an expert's reliability, which is required by

12

Accordingly, we reject the argument that the district court's exclusion of Matson was based on his general personal credibility. Additionally, we reject the argument that the district court's analysis somehow invaded the province of the jury by evaluating Matson's method based on factors not explicitly enumerated in Quiet Technology because a district court has "substantial discretion" in how it chooses to evaluate an expert's reliability, see Majors, 196 F.3d at 1215, and the factors listed in Quiet Technology are not the only factors that may be considered, see Quiet Tech. DC-8, Inc., 326 F.3d at 1341.

The putative class representatives' second argument—that the district court improperly took issue with Matson's data, and not his methodology—is equally without merit. While they suggest that the only methodology at issue was

_____

Daubert, and an expert's believability or persuasiveness, which is reserved for the trier of fact, see Quiet Tech. DC-8, Inc., 326 F.3d at 1341. As we explained in Quiet Technology, a district court's exercise of its gatekeeper function under Daubert "is not intended to supplant the adversary system or the role of the jury." See id. (citation omitted). Accordingly, a district court may not exclude an expert because it believes one expert is more persuasive than another expert. Additionally, a district court cannot exclude an expert because it believes the expert lacks personal credibility because of prior bad acts or other prior instances of untruthfulness. Vigorous cross-examination ensures that these issues of general credibility are properly presented for consideration by the trier of fact. See Daubert, 509 U.S. at 596, 113 S. Ct. at 2798. In evaluating the reliability of an expert's method, however, a district court may properly consider whether the expert's methodology has been contrived to reach a particular result. See Joiner, 522 U.S. at 146, 118 S. Ct. at 519 (affirming exclusion of testimony where the methodology was called into question because an "analytical gap" existed "between the data and the opinion proffered"); see also Elcock v. Kmart Corp., 233 F.3d 734, 748 (3d Cir. 2000) (questioning the methodology of an expert because his "novel synthesis" of two accepted methodologies allowed the expert to "offer a subjective judgment . . . in the guise of a reliable expert opinion").

13

Matson's use of an equation to determine isomalathion levels, this argument belies the fact that Matson employed two methodologies: first, he employed certain methods of extrapolation and transposition to arrive at temperature data; and second, he inserted the temperature data into an equation to arrive at the level of isomalathion in the Fyfanon. As we have explained, the district court's exclusion of Matson was based on its rejection of his methodology to derive temperature data, not the data itself. Thus, the district court's exclusion of Matson can be distinguished from a situation in which an exclusion is based on a district court's refusal to credit hard data arrived at by unassailable methods. See id. at 1345 (rejecting the argument that an expert should be excluded because "the specific numbers that [he] used were wrong"). Here, the data Matson produced was driven by the methodology he used, and thus the district court's inquiry into how he arrived at the data is not inappropriate considering that the district court is charged with evaluating an expert's methodology. See Fed. R. Evid. 702 (requiring expert testimony to be the "product of reliable principles and methods"); see also id. (requiring that an expert's testimony is based on "sufficient . . . data."); Joiner, 522 U.S. at 146, 118 S. Ct. at 519 (noting that a district court's consideration of data is proper in the context of evaluating methodology when an "analytical gap [exists] between the data and the opinion proffered").

Based on the foregoing, we find the district court did not abuse its discretion by excluding Matson. Because the district court's evaluation of Matson's methodology stayed within the limits prescribed by Daubert and its progeny, its exclusion of Matson was not "manifestly erroneous." Quiet Tech. DC-8, Inc., 326 F.3d at 1340. Additionally, we find that the district court properly excluded the toxicology experts and the physicians who treated the putative class representatives. The district court found that the excluded experts relied on Matson's findings, which we have found to be unreliable. Moreover, without Matson's foundational testimony that the Fyfanon used in the medfly spray was defective because it contained elevated levels of isomalathion, the testimony of the toxicologists—regarding the usual symptoms of isomalathion exposure—and the testimony of the treating physicians—regarding the congruence between these symptoms and the ailments allegedly suffered by the class representatives—is irrelevant. Accordingly, the district court's exclusion of the toxicology experts and the treating physicians was not an abuse of discretion. See Daubert, 509 U.S. at 589, 113 S. Ct. at 2795 (requiring expert testimony to be "relevant" to be admissible); Allison, 184 F.3d at 1320 (affirming exclusion of expert witness on relevance grounds because two other experts which were crucial to the expert's relevance were excluded).

15

B.  Grant of Summary Judgment

"We review de novo a district court's grant of summary judgment, applying the same legal standards as the district court."  McCorvey, 298 F.3d at 1257.  The grant of summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986).  In conducting this inquiry, we construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party.  See McCorvey, 298 F.3d at 1257.  Summary judgment must be granted if the nonmoving party has "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2252.

The district court granted summary judgment as to the negligence claims and the strict products liability claims because there was no evidence that the Fyfanon used in the medfly spray caused the putative class representatives' injuries.  The class representatives argue that summary judgment was improperly granted because, even without the testimony of Matson and the toxicologists, they could still meet their burden on the causation element through the testimony of the

16

treating physicians who, through differential diagnoses,[8] could testify that the most likely cause of the class representatives' injuries was exposure to Fyfanon.

This argument is insufficient to prevent summary judgment on two grounds. First, as we have explained, without Matson's evidence that the Fyfanon was defective or negligently stored because it contained elevated levels of isomalathion, the testimony of the treating physicians is irrelevant. To establish causation sufficient for a negligence claim in a products liability case, the plaintiff must prove by a preponderance of the evidence that his injury was proximately caused by the manufacturer's breach of its duty to produce a product reasonably safe for use. See Indem. Ins. Co. of N. Am. v. Am. Aviation Inc., 344 F.3d 1136, 1146 (11th Cir. 2003) (per curiam) (applying Florida law). To prove causation under a strict products liability theory, a plaintiff must prove that the product defect proximately caused his injury. See McCorvey, 298 F.3d at 1257 (citing Edward M. Chadbourne, Inc. v. Vaughn, 491 So. 2d 551, 553 (Fla. 1986)). Thus, under either theory of liability, necessarily antecedent to testimony from the treating physicians that defective Fyfanon caused the class representatives' injuries is evidence that the Fyfanon was defective or negligently handled in the first place. See Oken v. Monsanto Co., 371 F.3d 1312, 1314 (11th Cir. 2004) (per curiam)

---

[8]Differential diagnosis is a process by which a physician systematically eliminates possible causes of a patient's ailment to arrive at its most probable cause.

17

(noting that proving causation for negligence and strict liability claims requires proof of a breach or a defect and then proof that the specific breach or defect "alleged" caused the injury); Higginbotham v. Mobil Oil Corp., 545 F.2d 422, 427 (5th Cir. 1977) (noting that a defect must be established before presenting evidence regarding causation), rev'd on other grounds, 436 U.S. 618, 98 S. Ct. 2010 (1978). Because the district court found, and we agree, that there was no reliable expert evidence that the Fyfanon used over Tampa was defective without Matson's testimony, the testimony of the treating physicians is irrelevant and therefore was properly excluded. See Daubert, 509 U.S. at 589, 113 S. Ct. at 2795; Allison, 184 F.3d at 1320 (affirming exclusion of expert on relevance grounds).

Second, assuming arguendo that evidence of a defect or negligence could have been sufficiently proved to restore the relevance of the treating physicians' testimony, or that the putative class representatives were entitled to a presumption that the Fyfanon was defective under the principles of Cassisi v. Maytag Co., 396 So. 2d 1140, 1148 (Fla. Dist. Ct. App. 1981),[9] differential diagnoses alone would still be legally insufficient to meet their burden on causation. While numerous

[9] Under Florida products liability law, a jury may infer the product in question is defective at both the time of the injury and at the time of sale if it (1) malfunctions (2) during normal operation. See Cassisi, 396 So. 2d at 1148. A Cassisi inference only obviates the need to prove a defect; a plaintiff still bears the burden to show that the defect caused his injuries. See McCorvey, 298 F.3d at 1257 (noting that proof of a defect and proof of causation are separate elements in products liability claim).

18

federal courts have found differential diagnosis sufficiently reliable to be admissible under Daubert, see, e.g., Westberry v. Gislaved Gummi AB, 178 F.3d 257, 262-63 (4th Cir. 1999), we have found in the context of summary judgment that differential diagnosis evidence by itself does not suffice for proof of causation. See Rider, 295 F.3d at 1199 (finding case reports containing differential diagnoses insufficient to prove causation without further evidentiary support).

Without the expert testimony of Matson, the toxicologists, and the treating physicians, proof that defective Fyfanon caused the injuries alleged by the putative class representatives was lacking. Accordingly, because the putative class representatives failed to make a sufficient showing for an element on which they had the burden of proof, the district court properly granted summary judgment in favor of Cheminova. See Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2252.

C. Refusal to Grant Continuance

We review a district court's denial of a motion for a continuance under an abuse of discretion standard. See Quiet Tech. DC-8, Inc., 326 F.3d at 1351. The denial of a request for a continuance does not constitute an abuse of discretion unless it "severely prejudice[s]" the moving party. See Smith-Weik Mach. Corp. v. Murdock Mach. & Eng'g Co., 423 F.2d 842, 844 (5th Cir. 1970); see also Hashwani v. Barbar, 822 F.2d 1038, 1040 (11th Cir. 1987) (per curiam) ("The

denial of a continuance is within the broad discretion of the district court and will not be overturned unless arbitrary or unreasonable."). In reviewing a denial of a continuance request, we consider: (1) the moving party's diligence in its efforts to ready its case prior to the date set for hearing; (2) the likelihood that the need for a continuance would have been remedied had the continuance been granted; (3) the extent to which granting the continuance would have inconvenienced the court and the opposing party; (4) the extent to which the moving party might have suffered harm as a result of the district court's denial. See Quiet Tech. DC-8, Inc., 326 F.3d at 1351 (quoting Hashwani, 822 F.2d at 1040).

Based on these factors, we find that the district court did not abuse its discretion by refusing to grant a continuance. We find that the first factor favors Cheminova because the class representatives' sole reliance on Matson to prove the isomalathion levels in the Fyfanon did not represent the kind of diligence in trial preparation that merits a continuance. See Weisgram v. Marley Co., 528 U.S. 440, 456, 120 S. Ct. 1011, 1021 (2000) (faulting a litigant for not taking steps to supplement its evidence with another expert when the opposing party was challenging a crucial expert); Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 897, 110 S. Ct. 3177, 3193 (1990) ("[A] litigant's failure to buttress its position because of confidence in the strength of that position is always indulged in at the litigant's

20

own risk."). The third factor also weighs in favor of Cheminova because granting a continuance to allow the class representatives to find another expert would have required the court, as well as Cheminova, to invest more time and effort to determine the new expert's reliability. Requiring the district court and Cheminova to conduct such an inquiry at this advanced stage of litigation after already conducting an intensive Daubert hearing would represent a substantial inconvenience. The fourth factor also militates in favor of Cheminova because the class representatives did not suffer any harm by the district court's failure to grant a continuance. See Quiet Tech. DC-8, Inc., 326 F.3d at 1351 (finding no harm where the grant of a continuance would not have changed the disposition on the merits). Thus, although the grant of the continuance may have afforded the class representatives time to remedy the evidentiary hole in their case as to a product defect produced by the exclusion of Matson and other experts, the other Quiet Technology factors weigh in favor of Cheminova and demonstrate that the district court was within its discretion to deny the continuance. Moreover, we reject the class representatives' argument that it is an abuse of discretion per se if the district court's own order excluding an expert caused the need for the continuance. See Quiet Tech. DC-8, Inc., 326 F.3d at 1350-51 (finding no abuse of discretion in district court's denial of continuance request where it was the district court's own

declination to appoint an expert under Fed. R. Evid. 706 which factored into the need for the continuance); Pena v. Leombruni, 200 F.3d 1031, 1035 (7th Cir. 1999) (finding no abuse of discretion in district court's denial of continuance request to develop substitute expert testimony following its exclusion of an expert when litigant was on notice that the expert's admissibility would be challenged). Accordingly, on these facts, the district court was within its discretion to deny the putative class representatives' request for a continuance.

D.  Refusal to Certify Class Action

Finally, the putative class representatives argue that the district court improperly denied their request for class certification under Fed. R. Civ. P. 23(c)(4)(A).  Because we have found that summary judgment was properly granted as to the underlying claims of the class representatives, the issue of class certification is moot.  See Telfair v. First Union Mortgage Corp., 216 F.3d 1333, 1343 (11th Cir. 2000) ("With no meritorious claims, certification of those claims as a class action is moot.").  Accordingly, we decline to address the putative class representatives' class certification argument.

### III. CONCLUSION

We have previously noted that "[t]oxic tort cases . . . are won or lost on the strength of the scientific evidence presented to prove causation."  Rider, 295 F.3d

22

at 1197.  This case about exposure to an allegedly defective pesticide is no exception.  In an attempt to restore the testimony of their experts, the putative class representatives argued on appeal that the district court misapplied the principles of <u>Daubert</u> and therefore erred in its exclusion expert testimony.  Because the district court properly executed its gatekeeper function under <u>Daubert</u>, its exclusion of expert testimony was not an abuse of discretion.  Furthermore, because sufficient evidence of causation was lacking without the expert testimony, the grant of summary judgment was appropriate.  Accordingly, the district court's exclusion of expert testimony and grant of summary judgment are **AFFIRMED.**