[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11649
_____

D.C. Docket No. 9:17-cv-80883-DMM

GILBERTO DEJESUS,

Plaintiff - Appellant,

versus

SERGEANT WILLIE J. LEWIS,
INSPECTOR CHRISTOPHER DEAN CASTNER,
each in his individual capacity,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 21, 2021)

Before MARTIN, ROSENBAUM, and LUCK, Circuit Judges.

MARTIN, Circuit Judge:

Gilberto DeJesus says that in 2016, he was sexually assaulted by a prison official. That official, Sergeant Willie J. Lewis, responds that the assault never happened. Mr. DeJesus had an attorney to represent him in court, but shortly before trial, the District Court allowed counsel to withdraw. Mr. DeJesus was ill-prepared for trial because he had not been provided discovery materials. He was not given transcripts of the depositions taken in discovery until the morning of his trial, and tried to read through them—for the first time—during the morning break. Ultimately Mr. DeJesus presented only his own testimony to show the jury that the sexual assault he alleged he suffered amounted to cruel and unusual punishment. The jury ruled in favor of the Defendants.

On appeal, Mr. DeJesus argues the District Court made three errors. First, he says the District Court's instruction to the jury about what he had to prove to succeed on his Eighth Amendment claim against Sergeant Lewis misstated the law and increased his burden of proof. Second, he claims the court should have granted his motion to continue the trial in order to allow him to prepare his case. Finally, he argues that exceptional circumstances warranted the appointment of counsel after his former attorney withdrew from representation.

2

We recognize that no trial can be perfect. However, this record reflects an error here that we must address in order to clarify the rules governing allegations of sexual assault made by prisoners. That is to say, at a minimum, when a prisoner proves that a prison official, acting under color of law and without legitimate penological justification, engages in a sexual act with the prisoner, and that act was for the official's own sexual gratification, or for the purpose of humiliating, degrading, or demeaning the prisoner, the prison official's conduct amounts to a sexual assault in violation of the Eighth Amendment. Here, no one disputes that the conduct alleged served no legitimate penological purpose, so the jurors should have been instructed that the only fact they had to find was whether the sexual assault occurred. On this record, however, Mr. DeJesus has not met his burden to show that any errors made during the trial of his case were likely to have resulted in an incorrect verdict. We therefore affirm the District Court's order of final judgment in favor of Sergeant Lewis and Inspector Christopher Dean Castner.[1]

## I. BACKGROUND

A. THE INCIDENT

Mr. DeJesus, through counsel, filed suit in the U.S. District Court for the Southern District of Florida in July 2017. He alleged that on the morning of

---

[1] Sergeant Lewis and Inspector Castner are both appellees, but Mr. DeJesus's arguments on appeal relate only to the claim against Sergeant Lewis.

February 4, 2016, he left G Dormitory of South Bay Correctional Facility to go "drop a grievance at the grievance box." Mr. DeJesus said that as he walked back to G Dormitory, through the breezeway connecting the housing units, Sergeant Lewis pulled him out of the line and asked him, "[Y]ou like writing grievances, huh?" Mr. DeJesus alleged that Sergeant Lewis then pulled the elastic band of DeJesus's pants and said "you have a nice ass." When Mr. DeJesus tried to pull away, Sergeant Lewis "body slammed him to the ground." Next, according to Mr. DeJesus, Sergeant Lewis handcuffed him, digitally penetrated his anus, and said "this is what I think of you grievance writers." After this, Sergeant Lewis escorted Mr. DeJesus to administrative confinement, where DeJesus declared a psychological emergency so that he would be transferred to mental health confinement because "he was in fear that [Sergeant Lewis] was taking him to confinement to sexually assault him again."

Mr. DeJesus filed a grievance detailing this incident a few days later. About a month after he filed the grievance, Mr. DeJesus said Inspector Castner came to his cell and threatened to transfer him to another prison if he did not withdraw the grievance against Sergeant Lewis.

Mr. DeJesus brought two claims under 42 U.S.C. § 1983 against Sergeant Lewis and Inspector Castner. Mr. DeJesus alleged that Sergeant Lewis violated his Eighth Amendment right to be free from cruel and unusual punishment by sexually

4

assaulting him.  And he alleged that Inspector Castner violated his Eighth Amendment rights by improperly threatening retaliation for his exercise of the prison's grievance procedures.[2]  Both Defendants denied any wrongdoing.

B. PRE-TRIAL LITIGATION

Two days after Mr. DeJesus filed suit, the District Court set a trial date of March 19, 2018.  The parties then conducted discovery.  Defense counsel deposed Mr. DeJesus twice.[3]  Other prisoners and prison staff were also deposed.

In December 2017, Mr. DeJesus's attorney moved to withdraw from the case.  Counsel broadly cited irreconcilable differences and noted he did not know if Mr. DeJesus would consent to the motion to withdraw.  The District Court denied counsel's motion, explaining that the late stage of the case combined with the uncertainty as to whether Mr. DeJesus consented to counsel's withdrawal meant the court required more information about the nature of the irreconcilable differences counsel cited.  The court said counsel must confer with Mr. DeJesus

---

[2] Mr. DeJesus's claim against Inspector Castner was ultimately framed as arising under the First Amendment.

[3] Mr. DeJesus's deposition had to be rescheduled because on the first date, defense counsel was not able to bring a computer into the prison to share with DeJesus the security camera footage of the alleged incident.  Defense counsel participated in both depositions in person, but Mr. DeJesus's own attorney was present only by telephone.

and, if irreconcilable differences remained, counsel could file another motion describing "in detail" the nature of those differences.[4]

Mr. DeJesus's counsel filed a renewed motion to withdraw. Counsel explained that the irreconcilable differences were based on information that became available in discovery. First, counsel said he learned that during the incident, Sergeant Lewis seized from Mr. DeJesus a package of "spice," which is a synthetic cannabinoid that was considered contraband. Second, Julian Almeda, another prisoner, said Mr. DeJesus had a reputation for selling spice. And finally, counsel explained that Mr. Almeda, who previously provided a sworn affidavit saying that Sergeant Lewis sexually assaulted Mr. DeJesus, recanted his statement during his deposition and instead testified that not only did DeJesus write the affidavit, but Almeda was in confinement on the date of the incident and had no personal knowledge of it.

On January 22, 2018, less than two months before trial (and before Mr. DeJesus's response was filed),[5] the District Court found there were irreconcilable

---

[4] Before the District Court denied counsel's motion to withdraw, Mr. DeJesus submitted a motion for appointment of counsel, offering more details about his relationship with current counsel. The court did not receive Mr. DeJesus's motion until January 9, 2018, and did not consider it in ruling on counsel's motion to withdraw. Nevertheless, for purposes of this appeal it is relevant that in his motion for appointment of counsel, Mr. DeJesus informed the court he did not "know if discovery was completed" and he had never been given discovery.

[5] Mr. DeJesus filed a response to counsel's renewed motion on January 19, before the District Court ruled on it. But Mr. DeJesus had to rely on the prison to file his legal documents, and the court did not receive it until January 29. In his response, Mr. DeJesus again argued that

differences between DeJesus and his attorney and granted counsel's second motion to withdraw. The court also denied Mr. DeJesus's earlier motion for appointment of counsel, summarily finding that he had not shown "exceptional circumstances" requiring the appointment of counsel.

Mr. DeJesus moved for reconsideration of both these rulings. He argued the court ruled without giving him the opportunity to explain why exceptional circumstances existed. He also filed two additional motions. One was another motion for appointment of counsel, in which Mr. DeJesus cited his lack of legal training and the fact that his placement in "Protective Management" meant he had limited access to the law library, which restricted his ability to litigate his case. The other was a motion to continue the upcoming trial, in which he explained that his access to the law library was severely impaired because he was "in protective management due to being battered by gang members."

The District Court granted Mr. DeJesus's motion for reconsideration, recognizing it had ruled on counsel's motion to withdraw without hearing from DeJesus. Nevertheless, the court reaffirmed its earlier decisions. The District

---

his counsel engaged in professional misconduct by not being physically present during his deposition. Mr. DeJesus also argued that his counsel should have investigated the Defendants' claim that Mr. Almeda was lying. Mr. DeJesus said that if his counsel had done so, prison records would have contradicted Almeda's story that he was in confinement on the date of the claimed assault. Mr. DeJesus also indicated that his counsel "never discussed" with him the information counsel cited as the reasons for their irreconcilable differences.

Court noted that, by Mr. DeJesus's own account, there were irreconcilable differences between him and counsel that warranted counsel's withdrawal. The court also cited its "broad discretion" to decide whether to appoint counsel in civil cases and found there were no exceptional circumstances warranting appointment of counsel. This was because Mr. DeJesus "lost" his counsel only after counsel "sought to be removed based on [DeJesus's] credibility," and also because the court viewed DeJesus's legal claims as straightforward. The District Court also denied Mr. DeJesus's motion to continue the trial but said he could renew his argument for a continuance.

## C. TRIAL

The case proceeded to trial as scheduled. On the day trial began, Mr. DeJesus filed a third motion for appointment of counsel, arguing that he suffered from a long history of mental health issues and that Sergeant Lewis's sexual assault had affected him psychologically. Mr. DeJesus said he had made "repeated efforts to obtain a lawyer," because an attorney would be better equipped to handle the conflicting trial testimony than someone unfamiliar with civil law. During a pretrial colloquy with the parties, the District Court denied Mr. DeJesus's third motion, explaining that "[b]ased on the filings and including the filings of Mr. DeJesus's previous counsel, I have some doubts about the credibility of the case,"

8

and, especially because counsel "has withdrawn for ethical reasons, appointing a lawyer without pay . . . would be [in]appropriate."

The District Court also addressed some housekeeping matters. It noted that defense counsel had provided Mr. DeJesus with copies of deposition transcripts, which he requested a few days before at the final status conference. And the court denied Mr. DeJesus's request, also made at the status conference, to have another prisoner come in to testify as a witness. The court said the prisoner could not testify because the Department of Corrections requires a request be submitted 14 days in advance and Mr. DeJesus had not listed this particular witness on his witness list.[6]

In Mr. DeJesus's opening statement to the jury, he explained the basic facts as alleged in his complaint. He specifically described how, after submitting a grievance, Sergeant Lewis pulled him out of line, said he had "a nice ass," body slammed him, handcuffed him, pulled down his pants, and digitally penetrated his anus. Mr. DeJesus explained that the assault may have been in retaliation for a grievance he earlier wrote about an "Officer King," who he said was dating Sergeant Lewis and who referred to DeJesus using a racial slur. Defendants' opening statement laid out an alternative version of the story:

> This is a case about an inmate who was on disciplinary probation at the prison . . . , made a hand-to-hand drug

---

[6] Mr. DeJesus's witness list was filed by his former counsel in November 2017.

transaction, got caught by Sergeant Lewis, attempted to hide the drugs in the back of his pants, refused to give them over to Sergeant Lewis, had to be taken to the ground by Sergeant Lewis, where the drugs were ultimately recovered, with the assistance of Inspector Castner and Inspector [Marc] Simmons[.]

Court then recessed for a morning break, which Mr. DeJesus used to begin reading the five deposition transcripts defense counsel provided. When the parties came back, but before the jury was seated, the court asked Mr. DeJesus whether he wanted to have any of the depositions read to the jury. Mr. DeJesus said he did not know yet because this was the first time he'd seen the transcripts.[7] The court asked defense counsel whether anything in the transcripts would be useful to Mr. DeJesus. Counsel replied that the three prisoner depositions were "absolutely not useful," and actually contradicted Mr. DeJesus's story, which counsel opined was "one of the reasons why [DeJesus's counsel] wanted to withdraw from the case." Based on that description, the District Court told Mr. DeJesus "you probably are going to decide you don't want to use [the deposition transcripts], but I'll give you a chance to read them" during the lunch break.

After the jury was brought back in, Mr. DeJesus testified on his own behalf and told the same story he recounted in his opening statement. Defense counsel cross-examined him, at one point asking Mr. DeJesus to look at his deposition to

---

[7] The District Court asked Mr. DeJesus whether he had ever asked his lawyer for the transcripts. Mr. DeJesus said he did, but that his former counsel never sent them to him.

refresh his recollection about something.  Mr. DeJesus interrupted to tell the court that his lawyer "never gave me none of those depositions or none of this to prepare for this."  Defense counsel then tried to impeach Mr. DeJesus with his deposition testimony, but DeJesus said he could not remember and repeated that he did not have copies of any depositions and was "not prepared for this."  He continued: "I asked to please give me some type of help with counsel . . . .  I'm not prepared for this."  After some additional questioning, Mr. DeJesus again asked for counsel, but the District Court denied his request.

Mr. DeJesus took the lunch break to try to read the deposition transcripts he was given that morning.  After lunch, the District Court again asked whether he had decided to read any deposition testimony into the record.  Mr. DeJesus said he had not finished reading the depositions, but would probably like to introduce the testimony of Ruben Ruiz.  Based on representations from defense counsel, the court explained that if Mr. DeJesus introduced Mr. Ruiz's testimony, the Defendants would introduce contradictory testimony from other prisoners.  Mr. DeJesus again said he did not know what was in those deposition transcripts, but ultimately did not introduce any testimony.

After Mr. DeJesus rested his case, the Defendants called several witnesses, including three other witnesses to the incident, Sergeant Lewis, Inspector Castner, and Inspector Simmons.  These witnesses walked the jury through video

11

surveillance of the incident.  Sergeant Lewis saw another prisoner pass something to Mr. DeJesus in the breezeway, who put the object "[i]n the small of his back, like he was trying to put it in his pants area."  Sergeant Lewis pulled Mr. DeJesus out of line and patted him down.  Mr. DeJesus ignored Sergeant Lewis's questions about the object and "acted like he didn't know what [Lewis] was talking about."  Sergeant Lewis said Mr. DeJesus tried to break away from him, so he took DeJesus down to the ground.  At this point, Sergeant Lewis could see a bag sticking out of the top of Mr. DeJesus's pants.  Sergeant Lewis did not have handcuffs on him because he was not assigned any that morning, and did not have gloves, so he did not handcuff Mr. DeJesus or try to retrieve the bag.

By this time Inspectors Castner and Simmons noticed the scuffle and headed towards Sergeant Lewis and Mr. DeJesus.  Inspector Simmons handcuffed Mr. DeJesus.  Inspector Castner and Inspector Simmons both testified that they could see a plastic baggy "sticking out of the top" of Mr. DeJesus's pants.  The baggy "was not in [Mr. DeJesus's] body," rather, DeJesus's pants were sagging down slightly and the top of the baggy was "in clear view" sticking out from  his pants.  Inspector Simmons put gloves on and removed the bag without touching Mr. DeJesus's body.

The prison officials took Mr. DeJesus to the medical unit (as is required before a prisoner enters confinement), and then escorted him to administrative

12

confinement.  While he was in administrative confinement, Mr. DeJesus said he was suicidal, so prison officials transferred him for psychological observation.

Prison officials ultimately determined that the plastic baggy found on Mr. DeJesus contained synthetic cannabinoids referred to as spice.  There were individual packages inside the plastic baggy, which, in Inspector Simmons's experience, showed the contraband was probably intended to be sold.  Inspector Simmons filled out a disciplinary report, which noted that Mr. DeJesus had a package of synthetic cannabinoids "in between his butt cheeks."  Inspector Simmons said he wrote the report that way "[j]ust [to] specify exactly what part of [Mr. DeJesus's] person the drugs were located from."  Mr. DeJesus received the disciplinary report for possession of narcotics on February 10, 2016, six days after the incident.

Ten days after that, Mr. DeJesus called the Prison Rape Elimination Act's ("PREA")[8] tip line to report that he had been sexually assaulted.  The PREA investigation that followed exonerated Sergeant Lewis of all allegations.

---

[8] Congress unanimously passed PREA, 34 U.S.C. § 30301 et seq., to "establish a zero-tolerance standard" for sexual assault in United States prisons.  See id. §§ 30302(1), 30309(9)–(11); About – Prison Rape Elimination Act, National PREA Resource Center (last visited Aug. 2, 2021), https://www.prearesourcecenter.org/about/prison-rape-elimination-act.  PREA directed the Attorney General to "publish a final rule adopting national standards for the detection, prevention, reduction, and punishment of prison rape."  34 U.S.C. § 30307(a)(1).  The rule established standards for investigating and responding to allegations of sexual abuse committed against prisoners.  28 C.F.R. §§ 115.61–68, 115.71–73.

The jury heard more testimony that contradicted Mr. DeJesus's version of the events. The Defendants presented additional witnesses, including the prison grievance coordinator, who said that contrary to Mr. DeJesus's story, there was no record showing he submitted a grievance right before the incident with Sergeant Lewis. And the two named defendants specifically denied the allegations against them. Inspector Castner said he never threatened to transfer Mr. DeJesus if he refused to withdraw his grievance against Sergeant Lewis. Sergeant Lewis testified that he did not sexually assault or make any lewd remarks to Mr. DeJesus. He also said that he is married and never had any relationship with an "Officer King."

During his closing argument, Mr. DeJesus urged the jury to find that Sergeant Lewis sexually assaulted him. He also told the jury that his lawyer withdrew from the case "[a]t the last minute" and that he tried to get an attorney, but the District Court would not appoint one. In the Defendants' closing argument, defense counsel recounted the facts as testified to by their witnesses and asked the jury to judge Mr. DeJesus's credibility and find that he was lying.

At the end of closing arguments, the District Court gave the jurors their instructions, including Instruction 5.6, which informed them what Mr. DeJesus had to prove to succeed on his Eighth Amendment claim against Sergeant Lewis. In relevant part, the jury was asked to decide two questions: (1) whether "Sergeant

Willie J. Lewis intentionally committed acts that violated Gilberto DeJesus's right to be free from cruel and unusual punishment," and (2) whether Inspector Castner violated DeJesus's First Amendment right to access the courts. After about an hour of deliberating, the jury returned its verdict. The jury found that neither Sergeant Lewis nor Inspector Castner violated Mr. DeJesus's constitutional rights.

Two days later, the District Court entered final judgment in favor of the Defendants. This is Mr. DeJesus's appeal.

## II. JURY INSTRUCTION 5.6

We begin with Mr. DeJesus's argument that Instruction 5.6 misstated the law and informed the jury that he had to prove extra elements in order to succeed on his Eighth Amendment claim. We review de novo jury instructions to determine whether they misstate the law or mislead the jury "to the prejudice of the party who objects to them." Badger v. S. Farm Bureau Life Ins. Co., 612 F.3d 1334, 1339 (11th Cir. 2010); McNely v. Ocala Star-Banner Corp., 99 F.3d 1068, 1072 (11th Cir. 1996) (reviewing de novo the "subsidiary issue" of whether a jury instruction accurately reflected the law). However, because Mr. DeJesus failed to object to Instruction 5.6, we must also determine if any error is plain. Wood v. President & Trs. of Spring Hill Coll. in City of Mobile, 978 F.2d 1214, 1218 (11th Cir. 1992).

15

Mr. DeJesus argues that, by reading Instruction 5.6, the District Court instructed the jury that he had the burden of proving sexual assault and excessive force and malicious intent—which he says is more than necessary—to prove his Eighth Amendment claim against Sergeant Lewis. He says this Court's decision in Sconiers v. Lockhart, 946 F.3d 1256 (11th Cir. 2020), makes clear that sexual assault is per se excessive force such that the only fact he had to prove was whether the sexual assault occurred. This being the case, Mr. DeJesus says the instruction as given was inherently prejudicial (and thus plain error) because it increased his burden of proof.

We start by looking at the law governing Eighth Amendment sexual assault claims.

A. THE LAW GOVERNING EIGHTH AMENDMENT SEXUAL ASSAULT CLAIMS

There are distinct types of claims that can be brought by prisoners alleging cruel and unusual punishment under the Eighth Amendment. Prisoners can challenge their conditions of confinement, the excessive use of force against them, and the deliberate indifference to their serious medical needs. See Thomas v. Bryant, 614 F.3d 1288, 1303–04 (11th Cir. 2010); see also Sconiers, 946 F.3d at 1265 (stating that proof of an Eighth Amendment violation differs based on the type of violation alleged). Claims of sexual assault have generally been analyzed under the legal framework for excessive force claims. See Sconiers, 946 F.3d at

16

1265; see also Boxer X v. Harris, 437 F.3d 1107, 1111 (11th Cir. 2006), abrogated in part by Wilkins v. Gaddy, 559 U.S. 34, 130 S. Ct. 1175 (2010) (per curiam). The prisoner's claim must meet both a subjective and an objective component. The subjective component requires showing that the "force" used was "sadistically and maliciously applied for the very purpose of causing harm." Sconiers, 946 F.3d at 1265 (quotation marks omitted). And, in traditional use-of-force cases, the objective component looks to whether the officer's actions were "harmful enough" or "sufficiently serious." Id. at 1265 (quotation marks omitted). This excludes de minimis uses of force. Id. at 1265–66. However, in sexual assault cases, we view those components a bit differently.

Both parties agree—correctly, in our view—that this case is governed by Sconiers, which also addressed a prisoner's allegations that an officer "forcefully penetrated [the prisoner's] anus with his finger." 946 F.3d at 1260–61. Sconiers held that if an officer acted as Mr. Sconiers alleged—"forcefully shov[ing] his finger into Sconiers's unclothed anus after [the officer] had already taken Sconiers to the ground"—sexual assault "of this type" is malicious and sadistic and thus satisfies the subjective component. Id. at 1266. Sconiers went on to hold that an officer who commits this type of action "plainly commits severe sexual abuse of a prisoner," thereby satisfying the objective component. Id. (quotation marks omitted and alteration adopted).

17

In Sconiers, as here, there was no question that the conduct alleged was both sadistic and malicious as well as sufficiently serious.  But Sconiers also set forth four principles that apply in any case involving the sexual assault of a prisoner by a prison official.  First, unlike typical use-of-force cases,[9] sexual assault can never serve any valid penological purpose.  Sconiers, 946 F.3d at 1259.  Second, as stated above, sexual assault is a malicious and sadistic action that satisfies the subjective component of an Eighth Amendment claim.  Id. at 1266.  Third, sexual assault is never acceptable under contemporary standards of decency, which matters for purposes of satisfying the objective component.[10]  Sconiers, 946 F.3d at 1259; see id. at 1270–1272 (Rosenbaum, J., concurring) (recounting legislative enactments "show[ing] an unmistakable near-uniform consensus that sexual abuse of prisoners by prison guards . . . seriously violates 'contemporary standards of decency'"); Crawford v. Cuomo, 796 F.3d 252, 260 (2d Cir. 2015) (holding that the passage of PREA and states' laws criminalizing prison officials' sexual contact with prisoners make clear that the sexual assault of prisoners "offends our most

---

[9] See, e.g., Wilkins, 559 U.S. at 35, 130 S. Ct. at 1177 (describing prisoner's allegations that a prison official "snatched" him off the ground, "slammed him" to the floor, and punched, kicked, kneed, and choked him) (quotation marks omitted); Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 997 (1992) (recounting prisoner's testimony that prison officials punched and kicked him, while a supervisor told the officers "not to have too much fun") (quotation marks omitted).

[10] "The objective component of an Eighth Amendment claim is . . . contextual and responsive to contemporary standards of decency."  Hudson, 503 U.S. at 8, 112 S. Ct. at 1000 (quotation marks omitted).

18

basic principles of just punishment"). Finally, also related to the objective component, we look at the "nature" of the force used—and the harm from a sexual assault is inherently not de minimis. Sconiers, 946 F.3d at 1267 (quotation marks omitted); Wilkins, 559 U.S. at 39, 130 S. Ct. at 1179.

There is only one conclusion to draw from these principles. In a case brought by a prisoner alleging sexual assault by a prison official, that sexual assault necessarily violates the Eighth Amendment. In order for a prisoner to meet his burden on all elements of his Eighth Amendment claim, then, he need only show that the prison official committed a sexual assault. This means that the finders of fact need not consider the amount of force applied, the extent of the injury inflicted, or any effort the official made to temper the severity of the force used. Requiring a jury to make findings about the amount of force or the extent of the injury in cases involving sexual assault improperly suggests that some forms of sexual assault may be de minimis and thus do not rise to the level of an Eighth Amendment violation. Sconiers, 946 F.3d at 1259; see also id. at 1272 (Rosenbaum, J., concurring) ("[P]hysical sexual assaults by correctional officers of inmates violate the Eighth Amendment because no matter how difficult the inmate is, the official is never justified in punishing him in this manner.").

19

The question left open by Sconiers is what type of conduct qualifies as a sexual assault.[11] We begin to answer that question now. We hold that the "sexual assault" of a prisoner by a prison official in violation of the Eighth Amendment occurs when the prison official, acting under color of law and without legitimate penological justification, engages in a sexual act with the prisoner, and that act was for the official's own sexual gratification, or for the purpose of humiliating, degrading, or demeaning the prisoner. See 18 U.S.C. § 2246(2). At a minimum, those sexual acts include intentional sexualized touching underneath clothing,[12] such as fondling or penetration; coerced sexual activity; combinations of ongoing harassment and abuse; and exchanges of sexual activity for special treatment or to avoid discipline.[13] Sconiers, 946 F.3d at 1266 (holding that forceful digital

---

[11] Sconiers did not have reason to define sexual assault because the conduct Mr. Sconiers alleged so clearly contravened his constitutional rights. See 976 F.3d at 1266 ("[I]f a reasonable jury believed Sconiers's testimony, it would have to conclude that [the officer] sought to sexually abuse him. . . . We do not need to linger long over the contours of our standard."). The conduct in this case is the same as in Sconiers, and thus also clearly qualifies as sexual assault. Nevertheless, it is necessary to provide a definition for sexual assault that can be applied to any set of facts.

[12] Some clothed sexualized touching may also qualify as "sexual assault" in violation of the Eighth Amendment. But as we explain below, those types of allegations will need to be viewed on a case-by-case basis to evaluate whether they allege a "sexual assault" in violation of the Eighth Amendment.

[13] State and federal legislatures have made clear that conduct of this type is objectively serious enough to violate the Eighth Amendment. Sconiers, 946 F.3d at 1271 (Rosenbaum, J., concurring) (explaining that legislative enactments are "the clearest and most reliable objective evidence" of what violates contemporary standards of decency (quotation marks omitted)); see 18 U.S.C. §§ 2242, 2246(2) (criminalizing sexual abuse in prisons and defining the conduct that qualifies as a "sexual act" in violation of the statute); Crawford, 796 F.3d at 259–260 & nn.5–7

20

penetration of the prisoner's anus clearly met the objective and subjective components of an Eighth Amendment claim); <u>Ricks v. Shover</u>, 891 F.3d 468, 478 (3d Cir. 2018) (explaining what types of conduct are "objectively serious" enough to qualify as a constitutional violation).

A broader range of conduct certainly qualifies as sexual assault, depending on the facts of a given situation.[14]  Such determinations are for the finders of fact to decide in the first instance.  <u>See</u> <u>Ricks</u>, 891 F.3d at 478 (declining to adopt "a mechanical factors test" into what qualifies as sexual abuse in violation of the Eighth Amendment because "this inquiry is necessarily contextual, fact-specific, and to be conducted in the first instance by the District Court"); <u>cf.</u> <u>Jacobellis v. Ohio</u>, 378 U.S. 184, 197, 84 S. Ct. 1676, 1683 (1964) (Stewart, J., concurring) (acknowledging that some definitions of sexual acts are difficult to intelligibly define, "[b]ut I know it when I see it").  Nevertheless, we note it may be helpful for the fact-finder to consider things like whether the alleged conduct is of a sexual nature; whether the alleged sexual assault did in fact occur; and whether the prison

---

(recounting state legislative enactments criminalizing prison officials' sexual contact with prisoners and describing Congress's passage of PREA).

[14] We recognize this may include conduct that does not require any physical contact with a prisoner.  <u>See</u> 28 C.F.R. § 115.6(7)–(8) (adopting a broad definition of sexual abuse that violates PREA); National Standards To Prevent, Detect, and Respond to Prison Rape, 76 FR 6248-01, 2011 WL 318532, at *6250–51 (Feb. 3, 2011) (explaining that DOJ's proposed standards use the term sexual abuse because it "captures a broader range of sexual victimization than rape").  But because this case involves alleged physical contact, we need not and do not consider whether non-physical contact can constitute "sexual assault" for purposes of establishing an excessive-force claim under the Eighth Amendment.

official intended to sexually gratify himself or acted for the purpose of humiliating, degrading, or demeaning the prisoner.[15]

The definition of sexual assault we adopt today is similar to that used in other jurisdictions. See, e.g., Crawford, 796 F.3d at 254; id. at 259 n.7 (explaining the definition of sexual assault generally adopted by the majority of states); Bearchild v. Cobban, 947 F.3d 1130, 1144–45 (9th Cir. 2020) (analyzing a prisoner's sexual assault claim alleging that an officer's conduct began as "an invasive procedure that served a legitimate penological purpose," and thus required showing "that the guard's conduct exceeded the scope of what was required to satisfy whatever institutional concern justified the initiation of the procedure"). In adopting this definition, we recognize there are times when prison officials have a legitimate penological purpose to touch a prisoner in what may be an invasive manner, and we also account for the deference owed to prison staff. See Crawford, 796 F.3d at 258; Bearchild, 947 F.3d at 1145; see also 34 U.S.C. § 30309(12)

_____

[15] The concurring opinion appears to misunderstand our guidance here. See Concurring Opinion at 51–53. These considerations apply when the alleged misconduct does not necessarily qualify as a "sexual assault" under our description above. See supra at 20–21. When a jury finds that a prison official engaged in an act that fits within one of the "sexual assault" categories (i.e., it is an intentional sexualized touching underneath clothing, such as fondling or penetration; coerced sexual activity; a combination of ongoing harassment and abuse; or an exchange of sexual activity for special treatment or to avoid discipline, done without legitimate penological purpose and for the officer's sexual gratification or for the humiliation of the prisoner), these inquiries become moot because they are necessarily subsumed by that finding. But when a prison official allegedly commits some other type of sexual behavior, a jury must consider these types of inquiries to ascertain whether the conduct rises to the level of a "sexual assault" for purposes of the Eighth Amendment.

22

(excluding "legitimate medical treatment" and other medically necessary invasive searches from PREA's definition of rape and sexual abuse).

*    *    *

Before proceeding with the application of the controlling law to Mr. DeJesus's case, we address the ways in which the concurring opinion misconstrues our holding today. The concurring opinion demonstrates a fundamental misunderstanding of what our precedent requires in sexual assault cases.

Sconiers and Wilkins make sexual assault an Eighth Amendment violation in the Eleventh Circuit. The concurring opinion does not dispute this principle.

Rather the concurring opinion conflates what is required to prove the subjective and objective components of a sexual assault claim, when instead each requires a distinct inquiry. The concurring opinion says we "read[] out the core judicial inquiry" of an Eighth Amendment claim. Concurring Opinion at 51. We have not. We know that the "core judicial inquiry" on this topic looks at "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Sconiers, 946 F.3d at 1265 (quotation marks omitted). But this inquiry is the larger question that must include the subjective and objective components of an Eighth Amendment claim. See id. ("This standard requires a prisoner to establish two elements—one subjective and one objective[.]"). Our ruling here for Mr. DeJesus's case separately addresses

23

what is required to prove both the subjective and objective components in a sexual assault case. Again, our circuit has recognized that sexual assault can never serve any valid penological purpose and is malicious and sadistic such that a sexual assault satisfies the subjective component of an Eighth Amendment claim. Id. at 1259, 1266. We also know that sexual assault is never acceptable under contemporary standards of decency, such that the nature of the force used to commit a sexual assault is not de minimis. Id. at 1259, 1267; Wilkins, 559 U.S. at 39, 130 S. Ct. at 1179. And this satisfies the objective component.

The concurring opinion's confusion may arise from the definition of sexual assault we have adopted. But, contrary to the concurring opinion's contention, we have not eliminated either the subjective or the objective component of Eighth Amendment claims alleging sexual assault. See Concurring Opinion at 51–52. The definition of sexual assault we utilize here requires a jury to consider whether the prison official acted without legitimate penological justification and whether the official's conduct was for the official's own sexual gratification, or for the purpose of humiliating, degrading, or demeaning the prisoner. This inquiry clearly goes to the prison official's intent. Contra id. at 51. And although we hold that, where there is a sexual assault, it is not necessary to inquire into the amount of force applied, the extent of the injury inflicted, or any effort the official made to temper the severity of the force used in relation to the objective component, we

24

have not done away with the requirement to prove that the prison official's conduct was sufficiently severe. See id. at 44, 51 (arguing that we have conflated the issue of whether a prisoner's allegations of sexual assault ever occurred with the issue of whether that alleged conduct, "if true, was excessive" and meets the objective component). When jurors consider whether the prison official was acting without legitimate penological justification, they are considering whether the prisoner has met his burden of proof on the objective component. See Sconiers, 946 F.3d at 1266 (citing, inter alia, Ricks, 891 F.3d at 476) (recognizing that some contact, such as that involved in a body-cavity search, may amount to an Eighth Amendment violation if that contact "has no legitimate penological purpose" (quotation marks omitted)); Crawford, 796 F.3d at 256 ("[A] single act of sexual abuse may violate the Eighth Amendment if, as in this case, it is entirely gratuitous and devoid of penological purpose."). We recognize that not every invasive touching by a prison official amounts to an Eighth Amendment violation. See supra at 22. Nevertheless, the concurring opinion disregards the distinction we plainly made. We treat sexual assault cases differently because sexual assault is never acceptable under contemporary standards of decency.[16] Thus, when the

_____

[16] The concurring opinion cites Wilkins for its proposed two-step analysis, see Concurring Opinion at 49 (citing Wilkins, 559 U.S. at 40, 130 S. Ct. at 1138), but Wilkins was a "typical" physical assault case, not a sexual assault case. See Wilkins, 559 U.S. at 35, 130 S. Ct. at 1177. For this reason, the concurring opinion's rigid reliance on the two-step analysis in Wilkins is inapt. See supra at 18 & n.9. Consider the absurd consequences of adopting the

sexual assault occurs it is necessarily constitutionally excessive in violation of the Eighth Amendment.  Once a jury finds that a sexual assault that meets the definition here has occurred, it is not logical to also require the jury to go on to make a separate finding about whether the assault is sufficiently severe.

As we understand the reasons given in the concurring opinion for not joining our opinion, they reflect a flawed reading of our precedent as well as the holding we reach today.

## B.  REVIEWING INSTRUCTION 5.6 FOR PLAIN ERROR

With that, we must review whether Instruction 5.6 misstated the law of this circuit.  If Sergeant Lewis sexually assaulted Mr. DeJesus,[17] DeJesus has met his burden to show an Eighth Amendment violation.   See Sconiers, 946 F.3d at 1266–67.  But in order to reverse the jury's verdict based on a misstatement of law in a jury instruction, and on plain error review, the error must also be "so fundamental as to result in a miscarriage of justice."  Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1329 (11th Cir. 1999) (quotation marks omitted).  This type of error

---

concurring opinion's proposed two-step test here.  After the jury determines Sergeant Lewis acted as Mr. DeJesus alleged—digitally penetrating DeJesus's anus for no legitimate penological or medical purpose but instead for Lewis's own personal gratification or to demean or humiliate DeJesus—the concurrence would then have the jury make the redundant determination of whether this conduct, which qualifies as a sexual assault by any standard, is "severe" enough. We do not read the Supreme Court's or this circuit's precedent to require such an approach.

[17] Notably, there was no argument that any penological purpose existed for the specific conduct alleged here.  Thus the issue in Mr. DeJesus's case was whether the sexual assault happened at all.

26

only happens in "exceptional cases." Id. (quotation marks and emphasis omitted).

"To meet this stringent standard, a party must prove that the challenged instruction

[1] was an incorrect statement of the law and [2] that it was probably responsible

for an incorrect verdict, leading to substantial injustice." Id. at 1329–30 (quotation

marks omitted and alteration adopted). Mr. DeJesus therefore must prove that the

instruction misled the jury or left the jury to speculate as to an essential point of

law. Id. at 1330. "In other words, the error of law must be so prejudicial as to

have affected the outcome of the proceedings." Id. (quotation marks omitted).

### 1. Misstatement of Law

We review the jury instructions and verdict form together to determine

whether Instruction 5.6 misstated the law or misled the jury. McNely, 99 F.3d at

1072. At Mr. DeJesus's trial, the jury was instructed that in order for DeJesus to

prevail, he must prove four elements:

> First: That Sgt. Lewis intentionally digitally penetrated
> Mr. Dejesus's anus;
>
> Second: That the force used against Mr. Dejesus by Sgt.
> Lewis was excessive;
>
> Third: That Sgt. Lewis's conduct caused Mr. Dejesus's
> injuries; and
>
> Fourth: That Sgt. Lewis acted under color of law.

Elaborating on the second element, the District Court told the jurors they must

decide

whether any force used in this case was excessive based on whether the force, if any, was applied in a good-faith effort to maintain or restore discipline, or instead whether it was applied maliciously or sadistically to cause harm. In making that decision you should consider the amount of force used in relationship to the need presented; the motive of Sgt. Lewis; the extent of the injury inflicted; and any effort made to temper the severity of the force used. Of course, officers may not maliciously or sadistically use force to cause harm regardless of the significance of the injury to the prisoner. But not every push or shove—even if it later seems unnecessary—is a constitutional violation. Also, an officer always has the right to use the reasonable force that is necessary under the circumstances to maintain order and ensure compliance with jail or prison regulations.

The verdict form tasked the jury with finding whether Sergeant Lewis "intentionally committed acts that violated Gilberto Dejesus's right to be free from cruel and unusual punishment."[18] Our job here is to apply the principles governing Eighth Amendment sexual assault claims and decide whether, based on the entirety of Instruction 5.6 and the verdict form, the jurors understood the issues and were not misled.[19]

---

[18] If the jury answered yes to the first question, they were also required to determine whether Sergeant Lewis acted under color of law; and if so, whether Sergeant Lewis's conduct caused Mr. DeJesus's injuries.

[19] The Ninth Circuit recently addressed this precise issue in a case alleging sexual assault by a prison official. See Bearchild, 947 F.3d at 1135. Because the Ninth Circuit principles governing Eighth Amendment sexual assault claims are consistent with those recognized by our Court, we find Bearchild persuasive. See Bearchild, 947 F.3d at 1144–45; Sconiers, 946 F.3d at 1259, 1266–67.

Here, Instruction 5.6 required the jury to find both that the sexual assault occurred <u>and</u> that the force used against Mr. DeJesus was excessive. The jurors were not told that conduct amounting to a sexual assault is "by definition" sufficiently severe to qualify as an Eight Amendment violation. <u>Bearchild</u>, 947 F.3d at 1145; <u>see</u> <u>Sconiers</u>, 946 F.3d at 1266. Instead the jury was instructed to consider, in determining whether the force was excessive, "the amount of force used in relationship to the need presented," and "any effort made to temper the severity of the force used." But these directions were likely to mislead the jurors. The jury was never told that, due to the inherent nature of a sexual assault, proving an Eighth Amendment violation does not require an additional finding about the extent of physical force used. <u>See</u> <u>Sconiers</u>, 946 F.3d at 1259, 1267 (citing <u>Wilkins</u>, 559 U.S. at 39, 130 S. Ct. at 1179); <u>Bearchild</u>, 947 F.3d at 1145–46. It requires only proving that the sexual assault occurred. Further, the instruction to the jury that they consider the "extent of the injury inflicted," suggested that Mr. DeJesus was required to show Sergeant Lewis's actions caused physical injury. But this is not what our sexual-assault excessive-force precedent requires. <u>Sconiers</u>, 946 F.3d at 1267.

In sum, Instruction 5.6 misstated the law governing an Eighth Amendment claim in a sexual assault case. We offer no criticism of Eleventh Circuit Pattern Instruction 5.6 in the context of excessive-force cases, and note that no model jury

29

instruction for Eighth Amendment sexual assault claims currently exists. To reiterate, Eighth Amendment violations premised on a prison official's sexual assault of a prisoner are treated differently. Thus, when the District Court relied upon the more general pattern instruction for excessive force, it committed error in the context of a claim of sexual assault.

2. Prejudice

Having established error, Mr. DeJesus must still show he was prejudiced by the misstatement of law in Instruction 5.6. See Farley, 197 F.3d at 1329–30. He has not met this burden. We conclude that the instruction was likely not "responsible for an incorrect verdict" that would have affected the outcome of the trial, id., because the evidence reasonably supports the jury's finding that no sexual assault occurred. We briefly discuss the evidence again here.

Mr. DeJesus testified that Sergeant Lewis sexually assaulted him and made a lewd remark. As documentary evidence, Mr. DeJesus submitted the disciplinary reports filed after the incident, which provided a description of the incident: "DeJesus had a package containing 2 smaller packets containing 12 grams of (red) K-2 spice on his person in between his butt cheeks."[20] He also submitted a Florida regulation titled "Searches of Inmates," which stated that if an officer believes a

---

[20] At trial, Mr. DeJesus took the position that the contraband was not his and Sergeant Lewis planted it on him.

situation warrants the cavity search of a prisoner, certain procedures must be followed, including that medical personnel must perform the cavity search. See Fla. Admin. Code Ann. R. 33-602.204(3) (2020).

The Defendants' version of the facts, however, differs greatly. Sergeant Lewis expressly denied Mr. DeJesus's version of the events. He said he witnessed another prisoner pass something to Mr. DeJesus, who put the object in the back of his pocket or the back of his pants. It was this that caused Sergeant Lewis to confront Mr. DeJesus. Sergeant Lewis, Inspector Castner, and Inspector Simmons all testified that Simmons, not Lewis, handcuffed Mr. DeJesus after Simmons and Castner arrived to help. The three prison officials also testified that the plastic bag of what they believed to be contraband was in plain view, sticking out of the top of Mr. DeJesus's pants near the small of his back. And, again, all three officials testified that Inspector Simmons (who was wearing gloves) removed the object that was sticking out of Mr. DeJesus's pants. Inspector Simmons testified that when he wrote the disciplinary reports, he wrote the contraband was found between Mr. DeJesus's "butt cheeks" because he wanted to "specify exactly what part of [DeJesus's] person the drugs located were from." The contraband "was not in his body"; rather, Mr. DeJesus's pants were sagging down and the bag was sticking out near "the top of [his] buttocks" so Inspector Simmons "didn't even have to touch [DeJesus's] body to remove those drugs."

31

The jury also heard from several witnesses that the PREA investigation into the alleged assault cleared Sergeant Lewis of any misconduct. The jury heard other evidence that Mr. DeJesus had previously been convicted of crimes of dishonesty and that there was no record of DeJesus filing a grievance before the incident—which was the reason he said he was in the breezeway in the first place.

The jury was left to decide whether Sergeant Lewis sexually assaulted Mr. DeJesus. In response to the question, posed on the verdict form as to whether Sergeant Lewis "intentionally committed acts" that violated Mr. DeJesus's right to be free from cruel and unusual punishment, the jury said he did not. Mr. DeJesus argues that based on the instructions and the use of a general verdict form, the jury could have based its verdict on something other than a finding that the assault occurred. But because the evidence presented to the jury was offered to prove or disprove the fact of the assault, Mr. DeJesus's argument does not persuade us. Cf. Bearchild, 947 F.3d at 1135, 1148 (holding that the erroneous jury instruction prejudiced Bearchild because the officer was arguing the pat-down was invasive but permissible, not that it never happened, such that the jury still "likely would not have imposed liability" on the officer even if the jury disbelieved the officer).

On these facts, we recognize that Instruction 5.6 misstated the law. Nevertheless, Mr. DeJesus failed to meet his burden to show the instruction was responsible for an incorrect verdict.

32

### III.  MOTIONS FOR APPOINTMENT OF COUNSEL AND A CONTINUANCE

We next turn to Mr. DeJesus's challenges to the District Court's denials of his motion for a continuance and his motions for appointment of counsel.  We review each ruling for abuse of discretion.  Smith v. Fla. Dep't of Corr., 713 F.3d 1059, 1063 (11th Cir. 2013) (per curiam) (denying motion to appoint counsel); Rink v. Cheminova, Inc., 400 F.3d 1286, 1296 (11th Cir. 2005) (denying motion for continuance).  Mr. DeJesus relies on the same procedural history to argue that the District Court abused its discretion in denying each claim here, but we view the District Court's denial of Mr. DeJesus's request for a continuance as requiring more attention.  We therefore begin with that motion.

A. REQUEST FOR CONTINUANCE

In determining whether the District Court abused its discretion in denying a continuance, we consider: (1) the moving party's diligence in his efforts to prepare his case before trial; (2) the likelihood that the need for a continuance would have been remedied had the continuance been granted; (3) the extent to which granting the continuance would have inconvenienced the court and the opposing party; and (4) the extent to which the moving party might have suffered harm as a result of the district court's denial.  Rink, 400 F.3d at 1296.  This Court has called the fourth factor the "most important[]" factor, and has required the moving party to prove he was "extreme[ly]" or "severely" prejudiced.  Quiet Tech. DC-8, Inc. v. Hurel-

33

Dubois UK Ltd., 326 F.3d 1333, 1351 (11th Cir. 2003); Rink, 400 F.3d at 1296 (quotation marks omitted).

The District Court swiftly rejected Mr. DeJesus's request for a continuance, citing DeJesus's assertion that he was in protective custody and could not access the law library as the reasons for denying a continuance. But Mr. DeJesus offered another reason for needing a continuance—so that he "may properly prepare" for trial. And this wasn't the first time Mr. DeJesus told the court about his difficulty preparing for trial. In previous motions, he told the District Court that his former counsel did not discuss with him the facts revealed in discovery and reiterated that he did not "know if discovery was completed" because that "discovery has never been furnished to" him. At the status conference held one week before trial, Mr. DeJesus again told the District Court he had not received any deposition transcripts, including his own, and he did not know what they contained. Mr. DeJesus was provided with deposition transcripts on the morning of trial, but did not have time to read them and reiterated at least six times (including in his closing argument to the jury) that he was unable to prepare for trial. Based on these facts, Mr. DeJesus argues that all four continuance factors strongly favored granting his request for a continuance.

The first three factors—diligence, remedy, and inconvenience—weigh in Mr. DeJesus's favor. Rink, 400 F.3d at 1296. As described, Mr. DeJesus

34

consistently said he had not been provided with discovery, including deposition transcripts. This shows he was diligent in trying to prepare his case. Id. Second, the need for a continuance would have been remedied had the continuance been granted and the deposition transcripts provided. With a continuance Mr. DeJesus would have at least had a chance to read the depositions and make an informed choice about whether to introduce any of the deposition testimony. See id.; cf. Smith, 713 F.3d at 1064–65 (holding that "[u]nder the more lenient standards afforded to pro se litigants, Smith made a sufficient showing . . . to the district court that he was unable to present essential facts" when he told the court "he was not provided with his deposition transcript and other evidence was not produced"). Third, there is no evidence that granting the continuance would have inconvenienced the Defendants. We know this was a one-day trial, which is presumably easier to reschedule than a multi-day trial. Contra Quiet Tech. DC-8, 326 F.3d at 1351 (finding that this factor weighed against continuance when trial lasted three weeks and rescheduling would have been a burden on the court). And, as Mr. DeJesus points out, the Defendants have never argued they would suffer any inconvenience as a result of a continuance. Rink, 400 F.3d at 1296.

However, Mr. DeJesus is still required to show he was prejudiced. Quiet Tech. DC-8, 326 F.3d at 1351. The timeline enforced against Mr. DeJesus was harsh, and reflects that his decision not to introduce deposition testimony at trial

may not have been an informed decision.  Mr. DeJesus was given an hour-and-a-half (an hour-and-fifteen-minute lunch break and a fifteen-minute recess) to read at least three deposition transcripts of unknown length.  When he told the court he was unable to finish reading them during those breaks, the court responded, "Well, we need to get this done."  The court pushed Mr. DeJesus to make a decision, telling him to rely on defense counsel's description of the content of the depositions, which "d[idn't] sound good."

Even so, on this record, we cannot say that allowing a continuance to review discovery would have changed the jury's verdict.  See Quiet Tech. DC-8, 326 F.3d at 1351 (finding no prejudice as the result of the denial of the continuance because the movant's Daubert challenge "is unavailing on its merits"); Rink, 400 F.3d at 1296 (applying and characterizing Quiet Tech. DC-8 as holding that there is no harm "where the grant of a continuance would not have changed the disposition on the merits").  We briefly recount the depositions of three prisoners that were not timely provided to Mr. DeJesus.[21]

First, Julian Almeda originally provided an affidavit swearing that Sergeant Lewis sexually assaulted Mr. DeJesus.  However, in his deposition, Mr. Almeda testified that Mr. DeJesus wrote the affidavit and that Almeda was not present (and

---

[21] Although the deposition transcripts themselves are not in the record, the record contains descriptions of some of the deponents' testimony.

36

was in fact in confinement) on the day of the incident.  Mr. Almeda also testified that Mr. DeJesus had a reputation for selling spice, which is another name for the synthetic cannabinoids found on DeJesus.  Second, Bernard Terry testified he did not see any physical altercation but did see Sergeant Lewis try to pull something from Mr. DeJesus's pants.  Finally, Ruben Ruiz, Mr. DeJesus's friend, said he never saw the act described by DeJesus, and indeed saw DeJesus try to run from Sergeant Lewis as Lewis was giving DeJesus a command to stop.

Based on this testimony—and assuming Mr. DeJesus's motion for a continuance had been granted, he had been able to review each deposition, and had chosen to introduce any of them at trial—the jury would have heard facts that contradicted DeJesus's story.  In particular, if Mr. DeJesus introduced favorable testimony from Mr. Ruiz, as he contemplated, the Defendants would have introduced Mr. Almeda's and Mr. Terry's unfavorable testimony.  Mr. Almeda's and Mr. Terry's testimony would have corroborated the defense witnesses' testimony and depicted Mr. DeJesus as not credible.  It is highly unlikely that introducing the deposition testimony would have swayed the jury to find in Mr. DeJesus's favor.  On this record, Mr. DeJesus has not met his burden to show the District Court abused its discretion by denying the continuance.  See Quiet Tech. DC-8, 326 F.3d at 1351.

37

Although we hold that Mr. DeJesus's challenge to the District Court's denial of his motion for a continuance fails, we take this opportunity to emphasize the need to exercise care to remedy a prisoner's inability to prepare for trial after his attorney withdraws from the case. Cf. Griffith v. Wainwright, 772 F.2d 822, 825 & n.6 (11th Cir. 1985) (per curiam) (holding that courts should exercise "especial care" to provide pro se prisoners with notice of summary judgment procedures "so that any rights that such a litigant might have will not be extinguished merely through failure to appreciate the subtleties of modern motion practice").

B. APPOINTMENT OF COUNSEL

Next we turn to the District Court's denials of Mr. DeJesus's motions for appointment of counsel. To fall within the "exceptional circumstances" warranting appointment of counsel in a civil case, the "key is whether the pro se litigant needs help in presenting the essential merits of his or her position to the court." Smith, 713 F.3d at 1065 (quotation marks omitted). No single factor is dispositive, but the totality of the circumstances may tip the balance in favor of appointing counsel. See id. The factors include: (1) the type and complexity of the case; (2) whether the plaintiff is capable of adequately presenting his case; (3) whether the plaintiff is in a position to adequately investigate the case; (4) whether the evidence "will consist in large part of conflicting testimony so as to require skill in the presentation of evidence and in cross examination"; and (5) whether the

38

appointment of counsel would be of service to the parties and the court "by sharpening the issues in the case, shaping the examination of witnesses, and thus shortening the trial and assisting in a just determination." Ulmer v. Chancellor, 691 F.2d 209, 213 (5th Cir. 1982).[22]  The District Court may also inquire into whether the plaintiff has made any effort to secure private counsel.  See id.

Courts have granted motions for appointed counsel when the plaintiff's claims are based on widespread evidence that he did not personally experience; when there are "discovery issues," like not being provided copies of deposition transcripts or being prohibited from communicating with potential witnesses; or when there is other "suspect conduct" by the defendant, such as disregarding a court directive to provide the plaintiff with a copy of his own deposition transcript. See Smith, 713 F.3d at 1062, 1065.  Courts may also consider the plaintiff's capabilities of representing himself adequately, which may depend on whether "the facts and legal issues are so novel or complex as to require the assistance of a trained practitioner." Cf. Fowler, 899 F.2d at 1096 (finding no exceptional circumstances when, among other factors, the plaintiff's claims were "straightforward" and based on events he witnessed himself and plaintiff was "an accomplished writ writer who was capable of representing himself adequately").

_____

[22] This Court has adopted the Ulmer factors.  See, e.g., Fowler v. Jones, 899 F.2d 1088, 1096 (11th Cir. 1990) (affirming the denial of counsel where, among other factors, "the magistrate [judge] . . . indicated that he had properly considered the [Ulmer] factors").

39

Mr. DeJesus argues that his case presented exceptional circumstances that warranted appointment of counsel.  First, he argues that both his claims were complex because they turned on video evidence and conflicting witness testimony.  Next, he says his incarceration made things challenging because he was housed at a different facility than the one where the incident took place and was thus did not have easy access to the witnesses to the incident.  Third, Mr. DeJesus relies on his longstanding mental illness, which was negatively impacted by his having to cross-examine Sergeant Lewis, the alleged assailant.  Finally, Mr. DeJesus argues he did not have enough time to prepare for trial because his attorney withdrew two months before trial and failed to provide him with evidence obtained in discovery.  We now address each of the exceptional-circumstances factors.

The first factor—the type and complexity of the case—splits down the middle.  See Ulmer, 691 F.2d at 213.  On one hand, although Eighth Amendment cases may often be factually complicated, this case was based on a discrete event that occurred while Mr. DeJesus was present.  On the other hand, the legal issues related to the Eighth Amendment elements on which the jury properly should have been instructed make this case legally complicated.

Three factors tip against Mr. DeJesus.  As to the second factor, Mr. DeJesus showed at trial that he was capable of adequately presenting his case.  See id.  He cross-examined the Defendants' witnesses, introduced documentary evidence into

the record, and impeached witnesses with those documents. The fourth factor about conflicting testimony, requiring skill in the presentation of evidence and in cross-examination, also tips in favor of denying appointed counsel. See id. There was conflicting testimony in that it was Mr. DeJesus's word against the eyewitness-officers' words, but DeJesus does not argue that a lawyer skilled at presenting evidence and cross-examination would have obtained better or different results than he did in impeaching the officers with documentary evidence. Next, the fifth factor tips against appointing counsel because in this case, it was not necessary to "sharpen[] the issues in the case, shap[e] the examination of witnesses," or "shorten[] the trial and assist[] in a just determination." Id. The issues in the case were clear from the parties' arguments; Mr. DeJesus adequately examined witnesses; and only one day of trial was needed to examine the seven witnesses. See id.

One factor, however, clearly weighs in favor of appointing counsel. Mr. DeJesus was not in a position to adequately investigate and prepare for his case. By the time Mr. DeJesus moved for appointed counsel, his former counsel had completed several depositions but failed to give them to DeJesus. Mr. DeJesus was not able to obtain deposition transcripts until the first day of trial, even though he previously notified the court several times that he was not provided with discovery. See Smith, 713 F.3d at 1064–65 (holding that prisoner's inability to

41

obtain deposition transcripts, as well as other discovery issues and "suspect conduct" by the defendants "hindered Smith's ability" to prepare "the essential merits of his case" and necessitated the appointment of counsel).  Mr. DeJesus's lack of familiarity with the discovery materials affected his ability to prepare for trial, because he was forced to review the deposition transcripts during breaks in between witness testimony.

Nevertheless, we conclude that the District Court did not abuse its discretion in denying appointed counsel.

## IV.  CONCLUSION

For these reasons, we **AFFIRM** the District Court's rulings and the order of final judgment in favor of the Defendants.

LUCK, Circuit Judge, concurring in the result:

The majority opinion affirms the judgment for Sgt. Willie J. Lewis because: although the district court erred by giving the unobjected-to pattern jury instruction for Gilberto DeJesus's Eighth Amendment excessive force claim, the jury instruction error was not plain because it didn't affect the outcome of the trial; and the district court didn't abuse its discretion when it denied DeJesus's motion to continue the trial and motion for appointment of counsel. I agree that the district court properly exercised its discretion when it denied the motions to continue and to appoint counsel. And I agree we should affirm the judgment for Sgt. Lewis. But I write separately because I don't think the district court erred in giving the unobjected-to pattern jury instruction for Eighth Amendment claims. And I don't think the majority opinion's proposed instruction is consistent with our precedent.

*The district court did not err in instructing*
*the jury on DeJesus's Eighth Amendment claim*

DeJesus alleged, and testified, that Sgt. Lewis put his finger in DeJesus's anus. Sgt. Lewis and his defense witnesses testified that the incident never happened; that Sgt. Lewis never put his finger in DeJesus's anus.

Because there was a factual dispute, the first question the jury had to answer was whether the incident as alleged by DeJesus actually happened. Before anything else, the jury had to decide the predicate fact of whether Sgt. Lewis put his finger in

43

DeJesus's anus.  If Sgt. Lewis never did that, as he testified, then the verdict would be for Sgt. Lewis and there would be no need to decide the other issues.

If the jury found that Sgt. Lewis put his finger in DeJesus's anus, the next question is whether doing so was constitutionally excessive and violated the Eighth Amendment's prohibition on inflicting cruel and unusual punishments.  The jury must make that call because not every finger in an inmate's anus by a prison official is constitutionally excessive.  The jury has to distinguish "a medical professional performing an appropriate examination," Sconiers v. Lockhart, 946 F.3d 1256, 1266 (11th Cir. 2020), from a nurse seeking sexual gratification; "an officer executing a permissible search," id., from a prison official trying to humiliate an inmate.

This "core judicial inquiry" for "stating an excessive force claim" requires the jury to determine whether the digital penetration "was carried out maliciously and sadistically rather than as part of a good-faith effort to maintain or restore discipline." Wilkins v. Gaddy, 559 U.S. 34, 37, 40 (2010) (quotations omitted).  The case law—the Supreme Court's and ours—has fleshed out the factors to consider in deciding this core judicial inquiry.

In Wilkins, for example, the Supreme Court said that "the extent of injury suffered by an inmate is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation." Id. at 37 (quotation and brackets omitted).  And, in Sconiers, we explained that "the extent of injury may

44

shed light on the amount of force applied or 'whether the use of force could plausibly have been thought necessary.'"  946 F.3d at 1266 (quoting Wilkins, 559 U.S. at 37). In that case, for example, we considered that the prison official "shoved his finger" in the prisoner's anus "forcefully."   Id.; see also id. ("[T]his Court has held that severe or repetitive abuse of a prisoner by a prison official can violate the Eighth Amendment." (quotation omitted)).

We also, in Sconiers, considered the prison official's intent in digitally penetrating the prisoner's anus. "[T]o have a valid claim on the merits of excessive force in violation of the Eighth Amendment," we explained, "the excessive force must have been sadistically and maliciously applied for the very purpose of causing harm." Id. at 1265 (quotation and brackets omitted).

Finally, in Sconiers, we looked to the prison official's reason for the digital penetration and whether it had a "legitimate penological purpose." Id. at 1266 (quotation omitted).  "[A] medical professional performing an appropriate examination or an officer executing a permissible search" is different than a prison official "forcefully shov[ing] his finger in [the prisoner's] unclothed anus after [the official] had already taken [the prisoner] to the ground." Id.

If, after considering these factors, the jury finds that the digital penetration was constitutionally excessive under the Eighth Amendment, the jury must next find the extent of the prisoner's injuries (for purposes of damages) and whether the digital

45

penetration caused those injuries.  Importantly, the "lack of serious physical injury" does not defeat an Eighth Amendment excessive force claim.  Id. at 1267.  The excessive force claim survives even if the prisoner's injuries were de minimis. Wilkins, 559 U.S. at 34 (rejecting dismissal of an excessive force claim "based entirely" on the district court's "determination that [the] injuries were 'de minimis'"); see also id. at 40 ("[H]olding that the District Court erred in dismissing Wilkins' complaint based on the supposedly de minimis nature of his injuries . . . .").  But "the relatively modest nature of his injuries will no doubt limit the damages he may recover."  Id. at 40.

Applied here, the district court's unobjected-to excessive force pattern jury instruction was consistent with Wilkins and Sconiers.  The district court instructed the jury that, for DeJesus to succeed on his Eighth Amendment excessive force claim, it first had to find by a preponderance of the evidence that Sgt. Lewis digitally penetrated DeJesus's anus.  In other words, the jury had to determine whether DeJesus's allegations were true and whether the digital penetration actually occurred.

If the jury found that the digital penetration actually happened, it was instructed next to find whether the digital penetration was constitutionally "excessive."  The district court explained that the jury must determine "whether any force used in this case was excessive" based on the core judicial inquiry:  "whether

46

the force, if any, was applied in a good-faith effort to maintain or restore discipline, or instead whether it was applied maliciously or sadistically to cause harm." "In making that decision" on the core judicial inquiry, the district court told the jury that it "should consider" the Wilkins and Sconiers factors.

The jury should consider, the district court instructed, "the amount of force used in relationship to the need presented; the motive of Sgt. Lewis; the extent of the injury inflicted; and any effort made to temper the severity of the force used." And the jury was instructed to consider the legitimate penological purpose for the digital penetration—whether Sgt. Lewis "use[d] the reasonable force that is necessary under the circumstances to maintain order and ensure compliance with jail or prison regulations."

After considering the Wilkins and Sconiers factors, the jury was instructed to find the extent of DeJesus's injuries (for purposes of damages) and whether the digital penetration caused his injuries. But the jury was also told that the extent of DeJesus's injuries didn't matter if the digital penetration was excessive (that is, if Sgt. Lewis "maliciously or sadistically use[d] force to cause harm"). The jury was to award damages anyway even if DeJesus "submitted no credible evidence of injury" or his "injuries have no monetary value."

In sum, the Supreme Court explained in Wilkins that "to prevail" on an excessive force claim, the prisoner "will ultimately have to prove [1] not only that

47

the assault actually occurred, but also [2] that it was carried out maliciously and sadistically rather than as part of a good-faith effort to maintain or restore discipline." Id. at 40 (quotation omitted and numbers added). The district court's unobjected-to Eighth Amendment excessive force pattern jury instruction did exactly what the Supreme Court said in Wilkins. It first asked the jury to find whether the digital penetration "actually occurred." And then it asked the jury to determine the core judicial inquiry. This was not error, plain or otherwise.

*The majority opinion's proposed jury instruction does not follow Wilkins and Sconiers*

The majority opinion affirms the judgment for Sgt. Lewis because any error in the jury instruction did not affect the outcome of the trial. But, in order "to provide a definition for sexual assault that can be applied to any set of facts," Majority Op. at 20 n.11—including cases well outside the facts of this case and involving different allegations—the majority opinion offers its own proposed instruction for Eighth Amendment excessive force cases.

"In order for a prisoner to meet his burden on all elements of his Eighth Amendment claim," the majority opinion says, "he need only show that the prison official committed a sexual assault." Id. at 19. That means the jury "need not consider the amount of force applied, the extent of the injury inflicted, or any effort the official made to temper the severity of the force used." Id. The majority opinion then goes on to define "sexual assault," citing 18 U.S.C. section 2246(2), as "a sexual

48

act with [a] prisoner, and that act was for the official's own sexual gratification, or for the purpose of humiliating, degrading, or demeaning the prisoner." Id. at 20. "At a minimum," the majority opinion explains, "those sexual acts include intentional sexualized touching underneath clothing, such as fondling or penetration; coerced sexual activity; combinations of ongoing harassment and abuse; and exchanges of sexual activity for special treatment or to avoid discipline." Id.

For five reasons, the majority opinion's proposed jury instruction is inconsistent with Wilkins and Sconiers. First, it conflates the threshold factual issue of whether the prisoner's allegations actually happened with the separate constitutional issue of whether the alleged conduct, if true, was excessive. As the Supreme Court explained in Wilkins, whether "the assault actually occurred" and whether "it was carried out maliciously and sadistically" are separate and distinct issues. 559 U.S. at 40 (quotation omitted). "In order to prevail" on his Eighth Amendment excessive force claim, the prisoner "will ultimately have to prove not only that the assault actually occurred, but also that it was carried out maliciously and sadistically rather than as part of a good-faith effort to maintain or restore discipline." Id. (emphasis added). Here, for example, Sgt. Lewis and his witnesses denied that there was ever a finger inside DeJesus's anus. If the prisoner doesn't prove by a preponderance of the evidence that the allegations actually occurred, then

49

it's unnecessary for the jury to decide the harder constitutional question of whether the prison official's alleged conduct was excessive under the Eighth Amendment.

The majority opinion's proposed instruction illustrates this problem.  It asks whether Sgt. Lewis "digitally penetrated DeJesus's anus for no legitimate penological or medical purpose but instead for [Sgt.] Lewis's own personal gratification or to demean or humiliate DeJesus."  Majority Op. at 25 n.16.  But this collapses the factual question of whether the allegations actually happened with the constitutional question of whether what happened violated the Eighth Amendment.  For cases, like this one, where the prison officials testify that they never digitally penetrated the plaintiff, it doesn't make sense to lump into the same jury question the purpose of the digital penetration and the intent of the prison officials.

The majority opinion concedes that "it may be helpful" for the jury "to consider things like . . . whether the alleged sexual assault did in fact occur," but only for some cases and not for others.  Id. at 21–22 & n.15.  But there's no misunderstanding:  whether the alleged conduct actually occurred is not just a helpful consideration mixed in with a bunch of other factors.  And it is not optional for a certain slice of cases.  As the Supreme Court said, whether the alleged conduct actually occurred is one of the key facts that the prisoner "will ultimately have to prove" "[i]n order to prevail" on his excessive force claim.  Wilkins, 559 U.S. at 40.  It is not a "helpful" or optional factor for the jury to consider in certain excessive

50

force cases; it is part of the ultimate proof that the prisoner must present to the jury to prevail in any excessive force case.

Second, the majority opinion's proposed instruction reads out the core judicial inquiry. It never asks, as Wilkins and Sconiers require the jury to answer, whether the prison official's conduct was "a good-faith effort to maintain or restore discipline" or, instead, was done "maliciously and sadistically to cause harm." Sconiers, 946 F.3d at 1265 (quoting Wilkins, 559 U.S. at 37). The majority opinion says that it "know[s]" the core judicial inquiry and hasn't read it out, Majority Op. at 23, but its proposed instruction never uses the words good-faith, malicious, sadistic, or harm. Not once.

Third, the majority opinion's proposed instruction disregards some of the key factors the jury needs to consider in undertaking the core judicial inquiry. While the proposed instruction asks the jury about the prison official's intent, the nature of the allegations, and whether the conduct had a legitimate penological purpose, it doesn't tell the jury to consider, among other factors, the amount of force applied and the extent of the injury inflicted. This is contrary to Sconiers. There, we explained that, even though a significant injury isn't a necessary condition for an Eighth Amendment excessive force claim, "the extent of injury may shed light on the amount of force applied or 'whether the use of force could plausibly have been thought necessary.'" Sconiers, 946 F.3d at 1266 (quoting Wilkins, 559 U.S. at 37).

51

The Sconiers court looked to the amount of force the prison official used in determining whether the force was excessive. See id. (the prison official "force[d] his finger into [the] inmate's anus"); id. at 1267 (the prison official "forced his finger into [the plaintiff]'s anus"). And the Sconiers court discussed the extent of the prisoner's injury that resulted from the digital penetration. See id. at 1261 (The "digital penetration caused him anal pain for two weeks. In particular, [the plaintiff] complained that as a result of the incident, his anus stung when he had bowel movements, and he noticed blood on his toilet paper when he used the bathroom.").

Despite what we said and did in Sconiers, the majority opinion explains that we don't need to consider these factors because "when [a] sexual assault occurs it is necessarily constitutionally excessive in violation of the Eighth Amendment." Majority Op. at 25–26. Obviously, "severe or repetitive sexual abuse" of a prisoner violates the Eighth Amendment. See Sconiers, 946 F.3d at 1266 (quotation omitted). But this only begs the question: when is a prison official's conduct a constitutionally excessive sexual assault? As the majority opinion concedes, not every intentional touching or digital penetration of a prisoner is a sexual assault. And, because not every intentional touching or digital penetration is a sexual assault, the question is what factors must the jury consider in distinguishing "an appropriate examination" from a malicious one; "a permissible search" from a sadistic one. See id. Wilkins and Sconiers tell us what those factors are. The way the search and examination

52

were done, the amount of force used, and the injury they caused all "shed light" on

"'whether the use of force could plausibly have been thought necessary.'"    Id.

(quoting Wilkins, 559 U.S. at 37).

Fourth, the majority opinion's proposed instruction defines sexual assault for

"any set of facts," including for cases that are well beyond the facts of this case.  The

proposed instruction says that a "sexual assault" is a "sexual act," citing to 18 U.S.C.

section 2246(2), which defines "sexual act" for the federal criminal code:

> As used in this chapter . . .
>
> (2) the term "sexual act" means—
>
> (A) contact between the penis and the vulva or the penis and the anus,
> and for purposes of this subparagraph contact involving the penis
> occurs upon penetration, however slight;
>
> (B) contact between the mouth and the penis, the mouth and the vulva,
> or the mouth and the anus;
>
> (C) the penetration, however slight, of the anal or genital opening of
> another by a hand or finger or by any object, with an intent to abuse,
> humiliate, harass, degrade, or arouse or gratify the sexual desire of any
> person; or
>
> (D) the intentional touching, not through the clothing, of the genitalia
> of another person who has not attained the age of [sixteen] years with
> an intent to abuse, humiliate, harass, degrade, or arouse or gratify the
> sexual desire of any person . . . .

18 U.S.C. § 2246(2).  The proposed instruction also says that, "[a]t a minimum,"

sexual assault includes "intentional sexualized touching underneath clothing,"

"coerced sexual activity," "combinations of ongoing harassment and abuse," and

53

"exchanges of sexual activity for special treatment or to avoid discipline." Majority Op. at 20. But there are a host of problems with defining the scope of an Eighth Amendment excessive force claim with these examples and section 2246(2):

- To the extent the majority opinion uses section 2246(2) to define an excessive force claim under the Eighth Amendment, the proposed instruction turns this criminal statute into a private cause of action. Essentially, any violation of section 2246(2) would "necessarily" violate the Eighth Amendment. Majority Op. at 20. But criminal statutes rarely create private causes of action. See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 190 (1994) ("We have been quite reluctant to infer a private right of action from a criminal prohibition alone . . . . [W]e['ve] refused to infer a private right of action from a bare criminal statute. And we have not suggested that a private right of action exists for all injuries caused by violations of criminal prohibitions." (citation and quotation marks omitted)); Chrysler Corp. v. Brown, 441 U.S. 281, 316 (1979) ("[T]his Court has rarely implied a private right of action under a criminal statute, and where it has done so 'there was at least a statutory basis for

inferring that a civil cause of action of some sort lay in favor of someone.'" (footnote omitted)).[1]

- The proposed instruction, by using section 2246(2) and "intentional sexualized touching" to define sexual assault, would turn consensual sexual acts with a prisoner into a constitutional violation. While consensual sexual acts between prisoners and prison officials are never appropriate, it isn't clear that they necessarily violate the Eighth Amendment's prohibition on the infliction of cruel and unusual punishments. See, e.g., Brown v. Flowers, 974 F.3d 1178, 1183 (10th Cir. 2020) ("In Graham, we determined that guards who had sex with an inmate did not violate her constitutional rights because there was 'overwhelming evidence of consent.'" (citation omitted)); Freitas v. Ault, 109 F.3d 1335, 1339 (8th Cir. 1997) ("[W]e hold that . . . welcome and voluntary sexual interactions, no matter how inappropriate, cannot as a matter of law constitute 'pain' as contemplated by the Eighth Amendment."); Fisher v. Goord, 981 F. Supp. 140, 174 (W.D.N.Y.

---

[1] Child victims of sexual assault, as defined in the proposed instruction, may have a private cause of action under 18 U.S.C. section 2255(a). But the fact that Congress created a private cause of action for child victims of sexual assault strongly suggests that non-child victims like DeJesus do not have a private cause of action for section 2246(2) violations. See In re Wild, 994 F.3d 1244, 1260 (11th Cir. 2021) (en banc) ("Congress knows how to give crime victims a private cause of action when it wants to. Had it intended to do so in the [Crime Victims' Rights Act], it presumably would have enacted some provision that resembles [section] 2255. It didn't even come close, and its 'silence' in that respect 'is controlling.'" (citation omitted)).

1997) ("[C]onsensual sexual interactions between a correction officer and an inmate, although unquestionably inappropriate, and in this Court's view despicable, do not constitute cruel and unusual punishment under the Eighth Amendment."); see also Wood v. Beauclair, 692 F.3d 1041, 1048 (9th Cir. 2012) ("While we understand the reasons behind a per se rule that would make prisoners incapable of legally consenting to sexual relationships with prison officials, we are concerned about the implications of removing consent as a defense for Eighth Amendment claims.").

- The proposed instruction would turn non-severe or isolated acts, like a one-time slight touching, into sexual assaults in violation of the Eighth Amendment. While a one-time slight touching is not appropriate, Sconiers "held that 'severe or repetitive sexual abuse of a prisoner by a prison official can violate the Eighth Amendment.'" 946 F.3d at 1266 (emphasis added) (quoting Boxer X v. Harris, 437 F.3d 1107, 1111 (11th Cir. 2006), abrogated in part by Wilkins, 559 U.S. at 39); id. at 1267 ("Boxer X's holding that severe or repetitive sexual abuse of a prisoner by a prison official can violate the Eighth Amendment, remains good law . . . ."). And in Boxer X, we "join[ed] other circuits recognizing that severe or repetitive sexual abuse of a prisoner by a

prison official can violate the Eighth Amendment." 437 F.3d at 1111 (emphasis added).

- The proposed instruction turns every intentional sexualized touching, and even non-sexual abuse and harassment, into a sexual assault in violation of the Cruel and Unusual Punishments Clause without fully analyzing how the Supreme Court defines the "evolving standards of decency that mark the progress of a maturing society." Graham v. Florida, 560 U.S. 48, 58 (2010) (quotation omitted); see also Hudson v. McMillian, 503 U.S. 1, 9 (1992) (explaining, in the context of a prisoner's excessive force claim, that "the objective component of an Eighth Amendment claim" is "contextual and responsive to contemporary standards of decency." (citation and quotation marks omitted)). The majority opinion doesn't "determine whether there is national consensus," "as expressed in legislative enactments and state practice," criminalizing each subsection of section 2246(2) and each example that it says are, at minimum, a sexual assault. See Graham, 560 U.S. at 61 (citation omitted). Instead, the majority opinion merely cites to a part of the Sconiers concurring opinion that was not adopted by the court. Majority Op. at 18, 20 n.13. And even the unadopted concurring opinion only said that there was a consensus "that sexual

57

abuse of prisoners by prison guards, such as the type [the plaintiff] alleges, seriously violates 'contemporary standards of decency.'" Sconiers, 946 F.3d at 1271 (Rosenbaum, J., concurring). The prison official in Sconiers forcefully shoved his finger inside the prisoner's anus, after taking the prisoner down, for no legitimate penological reason. Id. at 1266 (majority opinion). That was the type of sexual abuse alleged by the Sconiers plaintiff that violated contemporary standards of decency. But the majority opinion's proposed instruction defines sexual assault to include consensual touching, non-severe and non-repetitive touching, and even no-touching-at-all, which are well beyond the consensus mentioned by the Sconiers concurring opinion.

- As for the majority opinion's reliance on section 2246(2) as support for an objective national consensus, the Supreme Court has rejected the argument that federal law represents a national consensus defining the limits of the Eighth Amendment. See Graham, 560 U.S. at 62 (rejecting as "incomplete and unavailing" the argument that there was "no national consensus against" sentencing juveniles to life without parole because "[f]ederal law also allows for the possibility of life without parole for offenders as young as [thirteen]"). And the majority opinion doesn't analyze "the standards elaborated by controlling precedents and

58

by the Supreme Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose" to "determine in the exercise of its own independent judgment whether" violating each of section 2246(2)'s four subsections, and each example it gives of sexual assault, "violates the Constitution." See id. at 61–62 (quotations omitted).

Fifth and finally, the majority opinion argues that "it is necessary to provide a definition for sexual assault that can be applied to any set of facts." Majority Op. at 20 n.11. But deciding the Eighth Amendment's scope for all excessive force cases and "any set of facts," even for cases and facts that have nothing to do with this case, is not necessary. See Burns v. Town of Palm Beach, 999 F.3d 1317, 1348 (11th Cir. 2021) ("Generally, we don't answer constitutional questions that don't need to be answered."). And the majority opinion's all-encompassing definition is not all-encompassing. As the majority opinion concedes, the proposed instruction's definition of "sexual assault" does not apply to any set of facts because a "broader range of conduct" outside its definition "certainly qualifies as sexual assault." Majority Op. at 21. "[T]his may include conduct that does not require any physical contact with a prisoner," id. at 21 n.14, and "[s]ome clothed sexualized touching," id. at 20 n.12. The majority opinion doesn't say what this other conduct is but, it assures us, jurors will know it when they see it. Id. at 21. Because, as the majority

opinion explains, excessive force claims are uniquely "depend[ent] on the facts of a given situation," id., and cannot be so neatly and easily defined, that's one more reason why we shouldn't adopt the proposed instruction. It muddies the waters more than it clears them up; it confuses more than it clarifies.

\* \* \* \*

The majority opinion's proposed instruction is inconsistent with Wilkins and Sconiers. It conflates the threshold factual issue of whether the prisoner's allegations actually occurred with the separate constitutional issue of whether the alleged conduct, if true, was excessive. It reads out the core judicial inquiry and some of the key factors used to decide whether a prison official's conduct is constitutionally excessive. And it expands excessive force claims well beyond the facts of this case and the controlling precedent interpreting the Eighth Amendment. I wouldn't adopt it.